**LAMAR HOMES, INC., Petitioner,**

v.

**MID–CONTINENT CASUALTY COMPANY, Respondent.**

No. 05–0832.

Supreme Court of Texas.

Argued Feb. 14, 2006.

Decided Aug. 31, 2007.

Rehearing Denied Dec. 14, 2007.

Lee H. Shidlofsky, Visser Shidlofsky LLP, Austin, TX, for Appellant.

John Engvall Jr., J. Jonathan Hlavinka, Engvall & Hlavinka, LLP, Jennifer Bruch Hogan, Richard P. Hogan Jr. and Matthew E. Coveler, Hogan & Hogan, L.L.P., Houston, TX, for Appellee.

E. Thomas Bishop, Bishop & Hummert, P.C., Dallas, Wade Caven Crosnoe, Thompson Coe Cousins & Irons, L.L.P., Austin, Patrick J. Wielinski, Cokinos Bosien & Young, Arlington, Jennifer Anne Lloyd, DLA Piper Rudnick Gray Cary US LLP, Austin, Charles J. Pignuolo, Law Office of Charles J. Pignuolo, Houston, James Perry Dyer, Texas Ass'n of Builders, Austin, John C. Tollefson, Tollefson Bradley Ball & Mitchell, LLP, Micah Ethan Skidmore, Haynes and Boone, L.L.P., Dallas, Richard Detrick Villa, Hughes & Luce, L.L.P., Austin, Levon G. Hovnatanian, Martin Disiere Jefferson & Wisdom L.L.P., Kevin D. Jewell, Chamberlain, Hrdlicka, white, Williams & Martin, Houston, Michael A. Ysasaga, Maxwell, Wagner & Ysasaga, P.C., Fort Worth, for Amicus Curiae.

Justice MEDINA delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice WAINWRIGHT, Justice GREEN, and Justice JOHNSON joined.

This case comes to us on certified questions from the United States Court of Appeals for the Fifth Circuit asking whether an insurer under a commercial general liability ("CGL") policy has a duty to defend its insured, a homebuilder, against a homebuyer's claims of defective construction. The Fifth Circuit has certified three questions for our consideration:

1. When a homebuyer sues his general contractor for construction defects and alleges only damage to or loss of use of the home itself, do such allegations allege an "accident" or "occurrence" sufficient to trigger the duty to defend or indemnify under a CGL policy?

2. When a homebuyer sues his general contractor for construction defects and alleges only damage to or loss of use of the home itself, do such allegations allege "property damage" sufficient to trigger the duty to defend or indemnify under a CGL policy?

3. If the answers to certified questions 1 and 2 are answered in the affirmative, does Article 21.55 of the Texas Insurance Code apply to a CGL insurer's breach of the duty to defend?

428 F.3d 193, 200–01 (5th Cir.2005). We conclude that allegations of unintended construction defects may constitute an "accident" or "occurrence" under the CGL policy and that allegations of damage to or loss of use of the home itself may also constitute "property damage" sufficient to trigger the duty to defend under a CGL policy. Accordingly, as to the duty to defend, we answer the first two questions,

yes. We do not reach the duty to indemnify, however, as that duty is not triggered by allegations but rather by proof at trial. We further conclude that former article 21.55 (recodified as sections 542.051–.061 of the Texas Insurance Code) does apply to an insurer's breach of the duty to defend and accordingly answer the third question, yes.

## I

Vincent and Janice DiMare purchased a new home from Lamar Homes, Inc. and several years later encountered problems that they attributed to defects in their foundation. The DiMares sued Lamar and its subcontractor complaining about these defects. Lamar forwarded the lawsuit to Mid–Continent Casualty Company seeking a defense and indemnification under a commercial general liability or CGL insurance policy. Mid–Continent refused to defend, prompting Lamar to seek a declaration of its rights under the CGL policy. Lamar also sought recovery under article 21.55 of the Texas Insurance Code.

On cross motions, the federal district court granted summary judgment for Mid–Continent, concluding it had no duty to defend Lamar for construction errors that harmed only Lamar's own product. *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 335 F.Supp.2d 754 (W.D.Tex.2004).

The court reasoned that the purpose of a CGL policy is "to protect the insured from liability resulting from property damage (or bodily injury) caused by the insured's product, but not for the replacement or repair of that product." *Id.* at 759. Noting disagreement among Texas courts about the application of the CGL policy under these circumstances, the Fifth Circuit has asked us to resolve the conflict.

## II

The first two certified questions focus on the meaning of the terms "occurrence" and "property damage" in the CGL policy. The CGL policy is a standard form developed by the Insurance Services Office, Inc. ("ISO")[1] and is used throughout the United States. *See* 2 JEFFREY W. STEMPEL, STEMPEL ON INSURANCE CONTRACTS § 14.01 (3d ed.2007). The meaning of these terms and their application to cases involving defective construction should therefore be the same in Texas as in the other states, but unfortunately there is no consensus on the policy's meaning under the circumstances posed here. Several courts have concluded that the CGL policy provides coverage for faulty workmanship that injures the work of the general contractor.[2] Other courts have concluded that coverage is not provided under these circumstances.[3] As the Fifth Circuit points out,

---

1. The ISO is the industry organization responsible for drafting the industry-wide standard forms used by insurers.

2. *See, e.g., Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302 (Tenn. 2007); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 137 P.3d 486 (2006); *French v. Assurance Co. of Am.*, 448 F.3d 693 (4th Cir.2006) (Va.law); *Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786 (8th Cir.2005) (Ark. & Wis. law); *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65 (2004); *Wanzek Constr., Inc. v. Employers Ins.*, 679 N.W.2d 322 (Minn., 2004); *Corner Constr. Co. v. U.S. Fid. & Guar.*, 638 N.W.2d

887 (S.D.2002); *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555 (3d Cir.2001) (N.J.law); *Fejes v. Alaska Ins. Co.*, 984 P.2d 519 (Alaska 1999); *High Country Assoc. v. N.H. Ins. Co.*, 139 N.H. 39, 648 A.2d 474 (1994); *McKellar Dev. v. N. Ins. Co.*, 108 Nev. 729, 837 P.2d 858 (1992).

3. *See, e.g., Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888 (2006); *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 621 S.E.2d 33 (2005); *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940 (9th Cir.2004) (Haw.law); *Corder v. William W. Smith Excavating Co.*, 210 W.Va.

even within Texas, intermediate courts of appeals disagree "on the application of these clauses in a CGL policy when the insured contractor is sued by a building owner for damage arising from shoddy construction of the building." 428 F.3d at 196.

At present, we have similar issues pending in six separate petitions for review involving CGL policies. *See Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.,* — S.W.3d —, 2006 WL 1892669 (Tex.App.-Houston [14th Dist.] 2006, pet. pending) (holding that defective construction can constitute an occurrence and be the cause of property damage); *Summit Custom Homes, Inc. v. Great Am. Lloyds Ins. Co.,* 202 S.W.3d 823 (Tex.App.-Dallas 2006, pet. pending); *Lennar Corp. v. Great Am. Ins. Co.,* 200 S.W.3d 651 (Tex.App.-Houston [14th Dist.] 2006, pet. pending) (same); *Grimes Constr., Inc. v. Great Am. Lloyds Ins. Co.,* 188 S.W.3d 805 (Tex.App.-Fort Worth 2006, pet. pending) (holding that defective construction that causes damage only to the contractor's own work is not an occurrence of property damage and thus does not invoke the duty to defend); *Archon Inv., Inc. v. Great Am. Lloyds Ins. Co.* 174 S.W.3d 334 (Tex.App.-Houston [1st Dist.] 2005, pet. pending) (holding that allegations of defective work

by a subcontractor causing damage to insured contractor's project invokes insurer's duty to defend); *Gehan Homes, Ltd. v. Employers Mut. Cas. Co.,* 146 S.W.3d 833 (Tex.App.-Dallas 2004, pet. pending) (same).

### III

The CGL policy provides that the insurance carrier "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and will "defend the insured against any 'suit' seeking those damages." The policy further provides that the "insurance applies to 'bodily injury' and 'property damage' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.' " [4] Consequently, the carrier's duty to defend is triggered by a claim for "property damage" or "bodily injury" caused by an "occurrence."

The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property." [5]

---

110, 556 S.E.2d 77 (2001); *Pursell Constr., Inc. v. Hawkeye–Security Ins. Co.,* 596 N.W.2d 67 (Iowa 1999).

**4.** The insuring agreement provides in pertinent part:

 SECTION I—COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement
 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty

to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .
 b. This insurance applies to "bodily injury" and "property damage" only if:
 (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

 * * *

**5.** The complete definition of property damage at Section V(17) of the CGL policy provides: " 'Property damage' means: a. Physical injury to tangible property, including all resulting

The first two questions ask whether defective construction or faulty workmanship that injures only a general contractor's own work (the home) constitute an "occurrence" or "property damage" under the CGL policy. Although certified as separate questions, the two are connected because both focus on the same property damage limitation, the home. Moreover, the CGL's insuring agreement ties the two concepts together by covering only those occurrences that cause property damage or bodily injury.

The insurance carrier maintains that the CGL policy does not cover defective construction that injures only the work of the general contractor for a number of reasons. First, the carrier argues that a CGL policy's purpose is to protect the insured from tort liability, not claims of defective performance under a contract. Although the plaintiffs allege negligence, the carrier submits that their claim against its insured is actually in contract because the economic-loss rule dictates that all damages arising from defective work constitute economic damages for breach of contract rather than property damage. The carrier further contends that defective work cannot be an "occurrence" because it is not accidental. In this regard, the carrier submits

that a general contractor should expect that faulty workmanship will result in damage to the project itself, and that if an injury is expected, it is not accidental. Finally, the carrier contends that extending CGL coverage under these circumstances transforms liability insurance into a performance bond.

The federal district court agreed with these arguments, concluding that an injury to the insured contractor's own work (the home) should not be considered an occurrence of property damage because the cost to correct faulty workmanship is an economic loss that a CGL policy should not cover.[6] The district court further reasoned that defective construction could be an occurrence, but only when the defect caused bodily injury or damaged the property of a third party. Because the plaintiffs here did not allege that a third party's property had been damaged, the court concluded the duty to defend had not been triggered under the CGL policy.

IV

■ We begin with the question whether defective construction or faulty workmanship that damages only the work of the insured is an "occurrence." As

---

loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

6. The court explains:

"The purpose of comprehensive liability insurance coverage for a builder is to protect the insured from liability resulting from property damage (or bodily injury) caused by the insured's product, but not for the replacement or repair of that product." *Jim Johnson Homes, Inc. v. Mid-Continent Cas. Co.*, 244 F.Supp.2d 706, 714 (N.D.Tex. 2003) (citing *T.C. Bateson Constr. Co. v.*

*Lumbermens Mut. Cas. Co.*, 784 S.W.2d 692, 694–95 (Tex.App. Houston [14th Dist] 1989, writ denied)). "If an insurance policy were to be interpreted as providing coverage for construction deficiencies, the effect would be to enable a contractor to receive initial payment for the work from the homeowner, then receive subsequent payment from his insurance company to repair and correct deficiencies in his own work." *Id.* (quoting *Bateson Constr. Co.*, 784 S.W.2d at 694–95). Thus, if the factual allegations read as a contractual breach for construction defects requiring repair or replacement instead of negligence resulting in property damage, the resulting damage for economic loss does not fall within the coverage of the insurance policy. 354 F.Supp.2d at 759.

previously mentioned, "occurrence" is defined, in part, as an accident, but accident is not otherwise defined in the policy. Terms that are not defined in a policy are given their generally accepted or commonly understood meaning. *W. Reserve Life Ins. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex.1953).

The insurance carrier submits that the damages alleged here for repairs to the home are direct economic damages flowing from Lamar's contractual undertaking and are "conclusively presumed to have been foreseen" by Lamar. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997). Thus, the carrier concludes that faulty workmanship is not an accident because injury to the general contractor's work is the expected and foreseeable consequence. The carrier relies on *Mid–Century Ins. Co. v. Lindsey*, where we explained that "an injury is accidental if 'from the viewpoint of the insured, [it is] not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, the injury could not reasonably be anticipated by insured, or would not ordinarily follow from the action or occurrence which caused the injury.'" 997 S.W.2d 153, 155 (Tex.1999) (quoting *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex.1976)).

*Lindsey*, however, did not adopt foreseeability as the boundary between accidental and intentional conduct. Insurance is typically priced and purchased on the basis of foreseeable risks, and reading *Lindsey* as the carrier urges would undermine the basis for most insurance coverage. Moreover, the carrier's argument includes a false assumption—that the failure to perform under a contract is always intentional (or stated differently "that an accident can never exist apart from a tort claim"). *See* Ellen S. Pryor, *The Economic Loss Rule and Liability Insurance*, 48 Ariz. L.Rev. 905, 917 (2006). Professor Pryor acknowledges that the argument has some intuitive appeal but concludes:

> Yet, on even a moment's reflection, we all understand that contracts are broken, many times, for reasons that we would call "accidental." The wrong number of boxes was shipped because someone made a mistake in the counting. The lawsuit was filed in the wrong venue because someone made a mistake when reading the venue statute. As one court explained, "at bottom, an occurrence is simply an unexpected consequence of an insured's act, even if due to negligence or faulty work."

*Id.* (quoting *Anthem Elecs., Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1056 (9th Cir.2002)).

■■■ An accident is generally understood to be a fortuitous, unexpected, and unintended event. *See* 1A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 360 at 449 (1981) ("something unforeseen, unexpected, and unpremeditated"); *see also* Webster's Third New International Dictionary of the English Language 11 (2002). "[I]t is that which occurs not as the result of natural routine, but as the culmination of forces working without design, coordination, or plan." 2 Alan D. Windt, Insurance Claims & Dispute § 11.3 at 296 (4th ed.2001). We have further said that an intentional tort is not an accident and thus not an occurrence regardless of whether the effect was unintended or unexpected. *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973). But a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly. *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416

S.W.2d 396, 400 (Tex.1967); *see also Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 F.3d 466, 473 (5th Cir.2001) ("if the act is deliberately taken, performed negligently, and the effect is not the intended or expected result had the deliberate act been performed non-negligently, there is an accident"). Thus, a claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort) or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not. *Lindsey,* 997 S.W.2d at 155.

Applying our prior decisions, the Fifth Circuit has concluded that the terms "accident" and "occurrence" include damage that is the "unexpected, unforeseen or undesigned happening or consequence" of an insured's negligent behavior, including "claims for damage caused by an insured's defective performance or faulty workmanship." *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.,* 197 F.3d 720, 725 (5th Cir.1999). The federal district court here distinguishes *Federated Mutual Insurance* by drawing the distinction between faulty workmanship that damages the insured's work or product and faulty workmanship that damages a third party's property. 335 F.Supp.2d at 760. *Federated Mutual Insurance* concerned only the latter circumstance, and thus the district court reasons that faulty workmanship that damages the property of a third party is a covered "occurrence," whereas faulty workmanship that damages the property of the insured contractor is not. *Id.*

■ The CGL policy, however, does not define an "occurrence" in terms of the ownership or character of the property damaged by the act or event. Rather, the policy asks whether the injury was intended or fortuitous, that is, whether the injury was an accident. As one court has observed, no logical basis within the "occurrence" definition allows for distinguishing between damage to the insured's work and damage to some third party's property:

> The logical basis for the distinction between damage to the work itself (not caused by an occurrence) and damage to collateral property (caused by an occurrence) is less than clear. Both types of property damage are caused by the same thing—negligent or defective work. One type of damage is no more accidental than the other. Rather, ... the basis for the distinction is not found in the definition of an occurrence but by application of the standard "work performed" and "work product" exclusions found in a CGL policy.

*Erie Ins. Exch. v. Colony Dev. Corp.,* 136 Ohio App.3d 419, 736 N.E.2d 950, 952 n. 1 (2000). We likewise see no basis in the definition of "occurrence" for the district court's distinction.

■ The determination of whether an insured's faulty workmanship was intended or accidental is dependent on the facts and circumstances of the particular case. For purposes of the duty to defend, those facts and circumstances must generally be gleaned from the plaintiffs' complaint. *See GuideOne Elite Ins. Co. v. Fielder Road Baptist Church,* 197 S.W.3d 305, 308 (Tex. 2006) (applying eight corners or complaint allegation rule). Here, the complaint alleges an "occurrence" because it asserts that Lamar's defective construction was a product of its negligence. No one alleges that Lamar intended or expected its work or its subcontractors' work to damage the DiMares' home. A CGL policy, however, does not cover every accident or occurrence—only those that cause "bodily injury" or "property damage." Thus, we turn

to the next question, whether defective construction or faulty workmanship damaging only the general contractor's work is "property damage" under the CGL policy.

The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." On its face, this definition does not eliminate the general contractor's work. The home and its component parts are clearly "tangible property." The DiMares alleged that Lamar was negligent in designing and constructing their home's foundation and that Lamar's defective workmanship caused the home's sheetrock and stone veneer to crack. These allegations of cracking sheetrock and stone veneer are allegations of "physical injury" to "tangible property." But the district court reasons that damage to the homebuilder's own work, the home, cannot be "property damage" because CGL insurance exists not to repair or replace the insured's defective work and that such an interpretation transforms CGL insurance into a performance bond.

Any similarities between CGL insurance and a performance bond under these circumstances are irrelevant, however. The CGL policy covers what it covers. No rule of construction operates to eliminate coverage simply because similar protection may be available through another insurance product. Moreover, the protection afforded by a performance bond is, in fact, different from that provided by the CGL insurance policy here.[7]

Some basis exists, however, for the district court's assumption that CGL insurance is not for the repair or replacement of the insured's defective work. The assumption proves true in many cases because several acts of faulty workmanship do not fall within coverage, either because they are not an "occurrence," "accident," or "property damage," or they are excluded from coverage by specific exclusions. For example, faulty workmanship that is intentional from the viewpoint of the insured is not an "accident" or "occurrence," and faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve "property damage." More often, however, faulty workmanship will be excluded from coverage by specific exclusions because that is the CGL's structure. *See generally* 2 STEMPEL ON INSURANCE CONTRACTS § 14.01.

The CGL's insuring agreement grants the insured broad coverage for property damage and bodily injury liability, which is then narrowed by exclusions that "restrict and shape the coverage otherwise afforded." *Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 790 (1979). Exclusions exist for intended or expected losses, as well as for contractually-assumed liabilities, obligations under worker's compensation and related laws, injury and damage arising out of aircraft and automobiles, pollution related claims, and for a number of so-called business risks. *See* 9 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE §§ 129:10–129:34 (3d ed.1997); 2 WINDT §§ 11:9–11.22. Several of these exclusions have specific application to the construction industry.

---

7. As one amicus submits, an insurance policy spreads the contractor's risk while a bond guarantees its performance. An insurance policy is issued based on an evaluation of risks and losses that is actuarially linked to premiums; that is, losses are expected. In contrast, a surety bond is underwritten based on what amounts to a credit evaluation of the particular contractor and its capabilities to perform its contracts, with the expectation that no losses will occur. Unlike insurance, the performance bond offers no indemnity for the contractor; it protects only the owner.

For example, exclusion j(5) eliminates coverage for "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." This exclusion applies while operations are being performed. *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 686–87 (Tex.App.-Houston [14th Dist.] 2006, pet. pending); *CU Lloyd's of Tex. v. Main Street Homes*, 79 S.W.3d 687, 696 (Tex.App.-Austin 2002, no pet.). Exclusion j(6) excludes coverage for "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." This exclusion further provides that it "does not apply to 'property damage' included in the 'products-completed operations hazard.'" Exclusion 1, on the other hand, applies to the "products-completed operations hazard," and generally excludes coverage for "property damage" to the insured's completed work with one notable exception for work performed for the insured by a subcontractor. It provides that the CGL policy does not apply to:

1. Damage to Your Work

 "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

 This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

■ Lamar submits that this exclusion would have eliminated coverage here but for the subcontractor exception. According to Lamar, this exception was added to protect the insured from the consequences of a subcontractor's faulty workmanship causing "property damage." Thus, when a general contractor becomes liable for damage to work performed by a subcontractor—or for damage to the general contractor's own work arising out of a subcontractor's work—the subcontractor exception preserves coverage that the "your-work" exclusion would otherwise negate. Lamar's understanding of the subcontractor exception is consistent with other authorities who have commented on its effect. *See, e.g.,* 2 STEMPEL ON INSURANCE CONTRACTS § 14[13][D] at 14–224.8–14–224.9;[8] 2 ALAN D. WINDT, INSURANCE CLAIMS & DISPUTE § 11.3 at 73–74 (4th ed.2006 supp.);[9] James D. Hendrick & James P. Wiezel, *The New Commercial General Liability Forms—An Introduction and Critique*, 36 FED'N INS. CORP. COUNS. A. 317, 360 (1986).[10]

---

8. "As a result of this consensus on the faulty workmanship issue, the insurance industry through ISO in 1986 began specifically providing coverage for claims arising out of allegedly faulty workmanship by subcontractors of the policyholder. The Your Work exclusion in the basic ISO CGL was amended to include a 'subcontractor exception' stating: 'This exclusion [the "Damage to Your Work" exclusion] does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.' With this action, the insurance industry essentially agreed to cover a huge portion of faulty workmanship claims, particularly those arising out of home building or other construction."

9. "If the policy's exclusion for damage to the insured's work contains a proviso stating that the exclusion is inapplicable if the work was performed on the insured's behalf by a subcontractor, it would not be justifiable to deny coverage to the insured, based upon the absence of an occurrence, for damages owed because of property damage to the insured's work caused by the subcontractor's work."

10. "[The subcontractor exception] should allow for coverage, for example if an insured

The standard-form CGL, however, has not always provided coverage for this business risk. At one time, CGL policies routinely excluded property damage to the homebuilder's work without regard to its cause. In 1976, however, insurers began offering an endorsement, known as the Broad Form Property Damage ("BFPD") endorsement, that extended coverage for damage to the builder's work if it were caused by a subcontractor.[11]

In 1986, the Insurance Services Office incorporated this aspect of the broad-form endorsement directly into the standard CGL policy by inserting the subcontractor exception into the "your-work" exclusion. *See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65, 82 (2004). By incorporating the subcontractor exception into the "your-work" exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance.[12] More recently, the Insurance Services Office has issued an endorsement that may be included in the CGL to eliminate the subcontractor exception to the "your-work" exclusion.

Rather than confront this exception directly, the insurance carrier argues the economic-loss rule, urging that damage to the insured's own work is not "property damage" but rather a contractual, economic loss. In this regard, the carrier equates "property damage" with tort liability just as it did with the term "occurrence." Thus, even though the plaintiffs have alleged that Lamar was negligent in the design or construction of their foundation, or both, and failed to perform its work in a good and workmanlike manner, the carrier concludes that these allegations do not invoke the duty to defend because the economic-loss rule limits the plaintiffs' remedy to a contract claim that the CGL does not cover.

The economic-loss rule, however, is not a useful tool for determining insurance coverage. The rule generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991). Its focus is on determining whether the injury is to the subject of the contract itself. In operation, the rule restricts contracting parties to contractual

---

general contractor is sued by an owner for damage to a completed residence, caused by faulty plumbing or electrical work done by a subcontractor. The coverage in that circumstance should extend to all 'work' damaged, whether it was done by the contractor or by any subcontractor, since the 'work out of which the damage arises was performed ... by a subcontractor.' The only property damage to completed work which is excluded by exclusion 'l' is damage to the insured contractor's work, which arises out of the insured contractor's work."

**11.** *See, e.g. Mid–United Contractors, Inc. v. Providence Lloyds Ins. Co.*, 754 S.W.2d 824, 827 (Tex.App.-Fort Worth 1988, writ denied) (construction defect claims against builder based on faulty workmanship of subcontractor covered under CGL policy with BFPD endorsement); *Fireguard Sprinkler Sys., Inc.*

*v. Scottsdale Ins. Co.*, 864 F.2d 648, 651–54 (9th Cir.1988) (explaining rationale for the development of the BFPD endorsement).

**12.** *See Limbach Co. v. Zurich Am. Ins. Co.*, 396 F.3d 358, 362–63 (4th Cir.2005) (discussing history of the addition of the "subcontractor" exception to the "your-work" exclusion); *Kalchthaler v. Keller Const. Co.*, 224 Wis.2d 387, 591 N.W.2d 169, 173–74 (1999) (reviewing insurance industry publications stating that the subcontractor exception results in coverage if the work out of which the damage arose was performed by the insured's subcontractor); *see also* 2 STEMPEL ON INSURANCE CONTRACTS § 14[13][D] at 14–224.9 ("With [the subcontractor exception], the insurance industry essentially agreed to cover a huge portion of faulty workmanship claims, particularly those arising out of home building or other construction.").

remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence. *See Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986) ("When the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone."). It is a liability defense or remedies doctrine, not a test for insurance coverage. *See, e.g., Ferrell v. W. Bend Mut. Ins. Co.,* 393 F.3d 786, 795 (8th Cir.2005) (holding that measure of damages under economic-loss rule "is distinct from the question whether there was 'property damage' under the policy").

 Contrary to the carrier's contentions, the CGL policy makes no distinction between tort and contract damages. The insuring agreement does not mention torts, contracts, or economic losses; nor do these terms appear in the definitions of "property damage" or "occurrence." The CGL's insuring agreement simply asks whether "property damage" has been caused by an "occurrence." Therefore, any preconceived notion that a CGL policy is only for tort liability must yield to the policy's actual language.[13] The duty to defend must be determined here, as in other insurance cases, by comparing the complaint's factual allegations to the policy's actual language. *See GuideOne Elite Ins. Co.,* 197 S.W.3d at 308.

The dissent, however, takes a different view, opening with the witticism that "[s]elling damaged property is not the same as damaging property." 239 S.W.3d at 255 (Brister, J. dissenting). Assuming

that this statement has something to do with the coverage issue in this case, we agree that the CGL policy distinguishes property damage that occurs while the contractor's work is ongoing from property damage that occurs after the work is complete. Both are "property damage" under the policy's definition, however, with distinctions thereafter drawn according to the previously discussed exclusions.

 If, on the other hand, the dissent's opening statement is meant to imply that selling property (the contractor's work) with a latent defect that subsequently causes a "physical injury to tangible property" is not "property damage" under the CGL's insuring agreement, then we disagree. From the balance of the dissent, we suspect that this is the intended meaning.

The dissent's infatuation with the economic-loss rule as a policy-construction tool leads to the conclusion that "property damage" does not mean what the policy plainly says, but rather is code for tort damages. Texas law, however, requires that insurance policies be written in English, preferably plain English, not code. Moreover, we have said that the label attached to the cause of action—whether it be tort, contract, or warranty-does not determine the duty to defend. *Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82 (Tex.1997).

The dissent also accuses the Court of creating coverage from the subcontractor exception to the your-work exclusion, noting that "it has long been understood that CGL insurance does not cover damage to an insured's own work." 239 S.W.3d at

---

**13.** *See* 2 JEFFREY W. STEMPEL, LAW OF INSURANCE CONTRACT DISPUTES § 14.02[d][1] at 14A–10 (2d ed. 1999) ("The language of the CGL policy and the purpose of the CGL insuring agreement will provide coverage for claims sounding in part in breach-of-contract/breach-of-

warranty under some circumstances."); *see also* 9 COUCH ON INSURANCE § 126:3 at 126–8 (3d ed.1997) ("the legal theory asserted by the claimant is immaterial to the determination of whether the risk is covered").

258 (citing Stewart Macaulay, *Justice Traynor and the Law of Contracts*, 13 Stan. L.Rev. 812, 825–26 (1961)). As already discussed, however, this understanding does not arise from the CGL's insuring agreement, which is quite broad, but from the business-risk exclusions that "restrict and shape the coverage otherwise afforded." *Weedo*, 405 A.2d at 790. When the dissent's law review was published in 1961, the author's understanding was correct because CGL policies generally excluded this type of business risk from coverage. But coverage for this type of risk depends, as it always has, on the policy's language, and thus is subject to change when the terms of the policy change. The dissent resolutely ignores these changes to the CGL while embracing the same regrettably overbroad generalizations condemned by other courts.[14] Contrary to the dissent's accusation, we have not said that the subcontractor exception creates coverage; rather, it reinstates coverage that would otherwise be excluded under the your-work exclusion.

Next, the dissent complains that we have inflated support for our interpretation of the CGL by failing to focus solely on the property damage issue, that is, whether defective construction that damages the contractor's work is property damage. Although the dissent finds this issue controlling, not many other courts have. Clearly, it is not the only piece of the insuring agreement at issue here and frankly is not the piece that has engendered the most discussion either in briefs to this Court or in the national debate.

Only two of the eleven cases comprising the dissent's asserted "majority rule" support the view that defective work that injures only the contractor's own work can be an "accident," but is not "property damage."[15] One of the eleven cases adopts a position directly contrary to the dissent, noting that injury to a contractor's own work may constitute property damage but is not an occurrence under the CGL policy.[16] Several of the cases, including the aforementioned three, conclude that defective work is not an accident under local law, or that defective work is a business risk the contractor must assume, or both.[17] We cannot speak for other states on the meaning of the term "occurrence" or "accident," but whether a business risk has been assumed or insured depends on the policy's language.

The dissent's "majority rule" is further undermined by its concession that the policies in some of the cases omit the subcon-

---

**14.** "CGL policies generally do not cover contract claims arising out of the insured's defective work or product, but this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an 'occurrence' within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL polices . . ." *Am. Family Mut.*, 673 N.W.2d at 76; *see also Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 307 (Tenn. 2007). Regrettably, the dissent would likewise have us apply the economic-loss rule without regard to the particular facts of the defective-work claim or the particular provisions of the CGL.

**15.** *ACUITY v. Burd & Smith*, 721 N.W.2d 33, 39 (N.D.2006); *Auto–Owners Ins. Co. v. Home Pride Cos.*, 268 Neb. 528, 684 N.W.2d 571, 577 (2004).

**16.** *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 621 S.E.2d 33, 36 (2005).

**17.** *See also Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 899 (2006); *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 948 (9th Cir.2004); *Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77, 82 (2001).

tractor exception. This made a difference in at least three cases on the dissent's list that were decided on the basis of express exclusions without regard to the insuring agreement or the definition of "property damage." [18] Finally, one of the dissent's cases does not even involve allegations of defective construction causing physical injury to property. *Pursell Constr. Inc. v. Hawkeye–Security Ins. Co.*, 596 N.W.2d 67 (Iowa 1999). Instead, the homeowners in *Pursell* claimed that the builder had breached its contract by building two homes below the elevation required by a city ordinance. *Id.* at 70. The claim apparently involved a purely economic loss without any consequential property damage, and thus probably failed to invoke the insurance carrier's duty to defend under the builder's CGL. The Iowa Supreme Court, however, did not focus on the absence of property damage but rather concluded that the builder's mistake did not constitute an occurrence or accident under Iowa law. *Id.* at 70–71. After examining the dissent's list, we conclude that the dissent has neither discovered a majority rule nor analyzed this case to fit within it.

Finally, the dissent's preoccupation with the question of ownership is misplaced. Critical to its analysis is the dissent's conclusion that the DiMares' claims accrued before they took title to the property. As previously noted, the policy's definition of property damage does not mention ownership as a factor, but the dissent thinks that it should be. Based on the contractual nature of the underlying claims and the assumption that all claims against the insured, Lamar, accrued at closing, the dissent concludes that the DiMares' "injuries occurred when the sale took place (though

the cracks appeared five years later)." 239 S.W.3d at 260.

■ While it is true that a breach of warranty claim generally accrues at the time of sale, "accrual is extended for warranties that explicitly guarantee future performance." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 92 (Tex.2004). The DiMares allege such a warranty, asserting the existence of an express warranty extending "at least one year from the date of closing." *See Austin Co. v. Vaughn Bldg. Corp.*, 643 S.W.2d 113, 115 (Tex.1982) (holding similar warranty claim to accrue against contractor when owner discovers construction defect). Moreover, the DiMares allege fraud and violations of the Deceptive Trade Practices Act that also implicate the discovery rule. *See, e.g., KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex.1999) (discovery rule applies to DTPA claim).

■ Contrary to the dissent's assumptions, the DiMares' claims did not accrue at the time of sale, but even had they accrued then, it would not make a difference. The policy defines "property damage" as "[p]hysical injury to tangible property" that the dissent concedes occurred after the transfer of title. The dissent's preoccupation with ownership is merely a stalking-horse for the carrier's contention that CGL policies are for tort claims only. The policy, however, does not include this limitation. The duty to defend must be determined under the eight-corners rule rather than by the labels attached to the underlying claims. *See Farmers Tex. County Mut. Ins. Co.*, 955 S.W.2d at 82.

---

18. *Commerce Ins. Co. v. Betty Caplette Builders, Inc.*, 420 Mass. 87, 647 N.E.2d 1211, 1214 (1995); *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 378 (Okla.1991); *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me.1989).

 The proper inquiry is whether an "occurrence" has caused "property damage," not whether the ultimate remedy for that claim lies in contract or in tort. An "occurrence" depends on the fortuitous nature of the event, that is, whether the damage was expected or intended from the standpoint of the insured. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 191–92 (Tex. 2002). "Property damage" consists of physical injury to tangible property and includes the loss of use of tangible property. Thus, we agree with the Fifth Circuit that "claims for damage caused by an insured's defective performance or faulty workmanship" may constitute an "occurrence" ·when "property damage" results from the "unexpected, unforeseen or undesigned happening or consequence" of the insured's negligent behavior. *Federated Mut. Ins. Co.*, 197 F.3d at 725. Accordingly, with respect to the duty to defend, we answer the first two questions, yes.

V

 Finally, the Fifth Circuit asks whether the "Prompt Payment of Claims" statute, formerly codified as article 21.55 of the Texas Insurance Code, applies to an insurer's breach of the duty to defend. The prompt-payment statute provides for additional damages when an insurer wrongfully refuses or delays payment of a claim. The statute has recently been recodified, without substantial change, as sections 542.051–.061 of the Texas Insurance Code, and our discussion here will refer to the current codification.

The prompt-payment statute provides that an insurer, who is "liable for a claim under an insurance policy" and who does not promptly respond to, or pay, the claim as the statute requires, is liable to the policy holder or beneficiary not only for the amount of the claim, but also for "interest on the amount of the claim at the rate of eighteen percent a year as damages, together with reasonable attorney's fees." TEX. INS.CODE § 542.060(a). "Claim" is defined as "a first party claim [ ] made by an insured or policyholder under an insurance policy or contract or by a beneficiary named in the policy or contract [that] must be paid by the insurer directly to the insured or beneficiary." *Id.* § 542.051(2). The statute does not separately define "a first-party claim," and Texas cases are divided as to its meaning.

One line of cases holds that an insured's claim for defense costs under a liability policy is not a "first-party claim" within the meaning of the prompt-payment statute.[19] These cases generally follow the reasoning of *TIG Insurance Co. v. Dallas Basketball, Ltd.*, 129 S.W.3d 232 (Tex. App.-Dallas 2004, pet. denied), which concluded that an insured's claim for defense costs was "fundamentally different than first-party claims for payment based on a loss suffered by the insured." *Id.* at 242. The court explained that an insured's claim for defense costs was not a first-party claim because (1) "[a] demand for a defense under a liability policy is not a claim for payment" as the statute requires, but rather a demand for services, *id.* at 239 (quoting statute's title "Prompt· Payment of Claims"); (2) a defense claim is not typically payable to the insured, but rather to the insured's attorney, thus it is not a claim "paid by the insurer directly to the insured or beneficiary" as the statute requires, *id.* (quoting former art. 21.55, § 1(3), now TEX. INS.CODE § 542.051(2)(B));

---

19. *See, e.g., Summit Custom Homes, Inc. v. Great Am. Lloyds Ins. Co.*, 202 S.W.3d 823 (Tex.App.-Dallas 2006, pet. pending); *Ulico Cas. Co. v. Allied Pilots Ass'n*, 187 S.W.3d 91, 104 (Tex.App.-Fort Worth 2005, pet. pending); *Serv. Lloyd's Ins. Co. v. J.C. Wink, Inc.*, 182 S.W.3d 19, 32–33 (Tex.App.-San Antonio 2005, pet. pending).

(3) an insured's claim for defense costs is not a policy claim but rather a breach of contract claim;[20] and (4) the cost of defending the insured is not a statutory "claim" because the structure and deadlines imposed by the prompt-payment statute do not work with this type of claim, *id.* at 240–41.

A conflicting line of authority holds that the insured's claim for defense costs is "a first-party claim" and that the prompt-payment statute does indeed apply when an insurer wrongfully refuses to pay for the insured's defense.[21] These cases principally stem from the suggestion in *State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex.1996), that the prompt-payment statute might hypothetically apply to an insured's claim for a defense under a liability policy. This line reasons that an insured's claim for defense costs is a first-party claim because it concerns a direct loss to the insured; that is, the claim does not belong to a third party. *See Rx. Com, Inc.*, 364 F.Supp.2d at 614–19 (rejecting the court's analysis in *TIG Ins. Co.*, 129 S.W.3d 232). We think that this reasoning is correct because it more accurately reflects the Legislature's purpose for enacting the prompt-payment statute.

As already noted, the statute does not define "first-party claim," but we have previously distinguished first-party and third-party claims on the basis of the claimant's relationship to the loss. Thus, we have said that a first-party claim is stated when "an insured seeks recovery for the insured's own loss," whereas a third-party claim is stated when "an insured seeks coverage for injuries to a third party." *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 n. 2 (Tex.1997). Based upon that distinction, a defense claim is a first-party claim because it relates solely to the insured's own loss.

Without the defense benefit provided by a liability policy, the insured alone would be responsible for these costs. Unlike the loss incurred in satisfaction of a judgment or settlement, this loss belongs only to the insured and is in no way derivative of any loss suffered by a third party. The claim for defense costs then is a first-party claim because the insured is the only party who will suffer the loss or benefit from the claim.

Some insurers have argued, however, that a "first-party claim" is synonymous with a claim under a first-party insurance policy. A first-party insurance policy is typically payable only to the insured or a

---

20. "Article 21.55 [the prompt-payment statute] applies only to claims that trigger the insurer's duty under the policy to pay the insured. *See* TEX.REV.CIV. STAT. ANN. art. 21.55, § 8; *see also Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex.2001) (required element of action under article 21.55 section 6 is a claim under an insurance policy"). It is TIG's breach of the insuring policies, rather than the policies themselves, that obligates TIG to reimburse the Mavericks [the insured]. "Accordingly, neither the Mavericks' claim for a defense nor its claim for reimbursement of defense costs is a 'claim' as defined by article 21.55." *TIG Ins. Co.*, 129 S.W.3d at 240.

21. *See, e.g., Rx.Com, Inc. v. Hartford Fire Ins. Co.*, 364 F.Supp.2d 609, 611–20 (S.D.Tex. 2005) (holding insured's request for a defense from liability insurer was first-party claim for purposes of article 21.55); *Hous. Auth. of Dallas v. Northland Ins. Co.*, 333 F.Supp.2d 595 (N.D.Tex.2004) (same); *Travelers Indem. Co. v. Presbyterian Healthcare Res.*, 313 F.Supp.2d 648 (N.D.Tex.2004) (same); *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F.Supp.2d 601, 632 n. 19 (E.D.Tex.2003) (same); *Mt. Hawley Ins. Co. v. Steve Roberts Custom Builders, Inc.*, 215 F.Supp.2d 783, 794 (E.D.Tex.2002) (same); *N. County Mut. Ins. Co. v. Davalos*, 84 S.W.3d 314, 319 (Tex.App.-Corpus Christi 2002), *rev'd on other grounds*, 140 S.W.3d 685 (Tex.2004).

named beneficiary for losses personal to the insured. A life, accident, and health policy is an example. In contrast, third-party insurance traditionally refers to liability policies that protect and indemnify an insured against the claims of unnamed third parties. Insurers have argued that by using the term "first-party claim" the Legislature actually intended to eliminate third-party insurance policies from the ambit of the prompt-payment statute.

But "first party" in the statute modifies "claim" and therefore does not limit the nature of the policy or insurer. TEX. INS. CODE § 542.051(2). In fact, the statute does not apply solely to first-party insurers, but rather expressly "applies to any insurer authorized to engage in business as an insurance company or to provide insurance in this state," including either a "stock . . . casualty insurance company" or "mutual . . . casualty insurance company." *Id.* § 542.052. The statute does exempt certain types of insurance, but liability insurance or third-party insurance is not among them.[22] *See Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 681 (Tex.1998) (noting "familiar rule of statutory construction that an exception makes plain the intent that the statute should apply in all cases not excepted").

Some courts have declined to apply the prompt-payment statute to a defense benefit because the benefit relates only to services and is not ordinarily paid directly to the insured. *See TIG Ins. Co.,* 129 S.W.3d at 240. That construction, however, would eliminate much of the statute's recognized application. For example, health insurance claims, property damage claims, and claims personal to the insured under an automobile policy are first-party claims that are often paid directly to the service provider rather than the insured. *See, e.g., Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 81 (Tex. 2000) (payment of medical bills to provider under health insurance). Determining the statute's application by whether the payments are made directly to the insured or to a service provider for the insured's benefit is a distinction without a difference. Moreover, it contravenes the Legislature's express intent that the statute should "be liberally construed to promote its underlying purpose which is to obtain prompt payment of claims made pursuant to policies of insurance." TEX. INS.CODE § 542.054; *see also State Farm Life Ins. Co. v. Martinez,* 216 S.W.3d 799, 805 & n. 26 (Tex.2007).

When the claim involves a defense benefit, the payee will always be either an insured or the insured's attorney, and for purposes of the prompt-payment statute, no reason supports distinguishing between the two. *See Dunn v. So. Farm Bureau Cas. Ins. Co.,* 991 S.W.2d 467, 473 (Tex. App.-Tyler 1999, pet. denied) (interpreting "claimant" to include the insured's attorney because "what a principal does through an agent, he does himself"). Because the statute is to be liberally construed, whether payment is received by the insured or defense counsel, the claim is one that "must be paid by the insurer directly to the insured." *See Rx. Com,* 364 F.Supp.2d at 618 (noting that the statute's requirement that claims be paid "directly to the insured" means that the statute applies to first-party claims, like the insured's right to a defense, not third-party claims).

---

**22.** Included on the statute's list of exempted types of insurance are: (1) workers' compensation insurance; (2) mortgage guaranty insurance; (3) title insurance; (4) fidelity, surety, or guaranty bonds; (5) certain marine insurance; and (6) a guaranty association created and operating under chapter 2602 of the insurance code. TEX. INS.CODE § 542.053.

Finally, some Texas courts have characterized the prompt-payment statute as "unworkable" in the context of the insured's claim under a defense benefit and have accordingly rejected its application under these circumstances. *See, e.g., TIG Ins. Co.*, 129 S.W.3d at 239. Because the prompt-payment statute imposes deadlines for responding to and paying valid claims and adds interest to the value of wrongfully denied claims, some courts have questioned how the statute can be applied to a defense claim, which typically has no finite value at the time the insurer denies it. *Id.* Other courts have not had the same difficulty with the statute. *See, e.g., Rx.Com*, 364 F.Supp.2d at 619.

The prompt-payment statute requires that an insurer follow certain procedures when responding to claims and deciding whether to pay them. First, the statute requires that the insured submit a written notice of claim which then triggers the insurer's duties to investigate and acknowledge the claim. TEX. INS.CODE §§ 542.051(4), 542.055. The statute specifies that an insurer has fifteen days after receiving notice of a claim to (1) acknowledge receipt, (2) commence its investigation, and (3) "request from the claimant all items, statements and forms that the insurer reasonably believes, at that time, will be required from the claimant." *Id.* § 542.055. If its investigation reveals that additional information is needed from the claimant, the insurer may make additional requests. *Id.* § 542.055(b). The statutory deadlines for accepting and paying the claim do not begin to run until the insurer has "receive[d] all items, statements, and forms required by the insurer to secure final proof of loss." *Id.* §§ 542.056(a), 542.058.

The court in *TIG* recognized the difficulty in applying this procedure to an insured's claim for a defense, observing that at the time of the claim the insured typically has not yet suffered any actual loss. 129 S.W.3d at 239. The court then queried whether the insured would have to submit his legal bills to the insurance company, as received, to mature its rights under the prompt-payment statute. *Id.* at 241. The statute's apparent answer is, yes. *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 565 (5th Cir. 2004) (holding that prejudgment interest should accrue "based on the dates Plaintiffs paid each bill for attorney's fees rather than the date [the insurer] refused to defend Plaintiffs"). As one amicus in this case submits, when the insurer wrongfully rejects its defense obligation, the insured has suffered an actual loss that is quantified after the insured retains counsel and begins receiving statements for legal services. These statements or invoices are the last piece of information needed to put a value on the insured's loss. *See* TEX. INS.CODE § 542.056(a). And when the insurer, who owes a defense to its insured, fails to pay within the statutory deadline, the insured matures its right to reasonable attorney's fees and the eighteen percent interest rate specified by the statute. *Id.* § 542.060.

The final certified question then is a matter of statutory construction, which is a question of law. *Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 529 (Tex. 2002). When construing a statute, we begin with its language, and when possible, we determine what the Legislature intended from its own words. *State of Tex. v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006). In determining its meaning, we must also consider the statute as a whole and construe it in a manner which harmonizes all of its various provisions. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). Applying these rules, we conclude that the Legislature did not intend to limit

the prompt-payment statute to first-party insurance, but rather intended that it apply to claims personal to the insured ("a first-party claim"). Accordingly, Lamar's right to a defense benefit under a liability insurance policy is a "first-party claim" within the statute's meaning. Our answer to the Fifth Circuit's third question is, therefore, yes.

\* \* \* \* \*

In summary, we conclude that allegations of unintended construction defects may constitute an "accident" or "occurrence" under a CGL policy and that allegations of damage to, or loss of use of, the home itself may also constitute "property damage" sufficient to trigger the duty to defend under a CGL policy. We further conclude that the prompt-payment statute, formerly article 21.55, and now codified as sections 542.051–.061 of the Texas Insurance Code, may be applied when an insurer wrongfully refuses to promptly pay a defense benefit owed to the insured.

Justice BRISTER filed a dissenting opinion, in which Justice HECHT and Justice WILLETT joined.

Justice BRISTER, joined by Justice HECHT and Justice WILLETT, dissenting.

*Selling* damaged property is not the same as *damaging* property. Among other differences, only the latter begets a claim for property damage. When the homebuyers here sued their builder for construction defects, they did not claim the builder damaged their property; instead, they alleged broken promises and breached duties connected with the sale. Those

were not property damage claims, and thus were not covered by the builder's CGL policy.

The Court's conclusion to the contrary turns the construction industry on its head. Instead of builders standing behind their subcontractors' work and making necessary repairs, the Court shifts that duty to insurance companies. Every crack, stain, dent, leak, scratch, and short-circuit arising from a subcontractor's work (which will be most of them) must be repaired by the builder's insurer, who may have to pay the builder to repair its own home. Why should builders avoid unqualified subcontractors if their insurers (and other policyholders) will pay the consequences? No one really believes this is what the parties intended—that for a $12,005 annual premium the insurer agreed to repair all damage to every home Lamar Homes had ever sold (at the rate of almost $3 million annually). As that is precisely what the Court holds today, I respectfully dissent.

The CGL insurance policy provides coverage only for suits seeking "bodily injury" and "property damage," the latter being defined to include "physical injury to tangible property." The homebuyers here certainly alleged their home suffered physical injury—foundation deflection, cracks in sheetrock and stonework, and doors that no longer worked properly. But the contract, warranty, fraud, DTPA, and negligence claims they brought against Lamar Homes were for breaching its promises and legal duties as a seller.[1] Such claims are for economic loss rather than property damage, so the policy does not cover them.

---

1. Specifically, the homebuyers alleged that Lamar Homes breached express and implied warranties that their home would be designed and constructed in a good and workmanlike manner; breached the DTPA by breaching those warranties; breached the DTPA by misrepresenting the reinforcement in their slab; committed fraud by making the same misrepresentations; and (along with its subcontractors) negligently designed their foundation.

Thirty years ago in *Nobility Homes of Texas, Inc. v. Shivers* (a case involving a mobile home warranty claim), we held that "economic loss is not 'physical harm' to the user or his property."[2] Ten years later in *Jim Walter Homes, Inc. v. Reed*, we applied the same rule to homebuyers suing a builder for an inadequate foundation (precisely the allegations here), holding that such claims were for economic loss rather than property damage:

> When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. The Reeds' injury was that the house they were promised and paid for was not the house they received. This can only be characterized as a breach of contract....[3]

The distinction between claims for economic loss and property damage is by no means limited to Texas; federal law and most states draw the same sharp line between them.[4] As the Restatement (Third) of Torts states, "harm to persons or property includes economic loss if caused by harm to ... the plaintiff's property *other than the defective product itself.*"[5] As a tentative draft of the Restatement states the law:

> When a service provider is responsible for a latent physical defect in property, physical impairment of the property resulting from the defect is not physical harm to that property or to other property that is part of an integrated whole with that property.[6]

An illustration in the tentative draft specifically applies it to foundation defects like the one at issue here.[7]

Granted, the CGL policy does not distinguish between contract and tort claims, or mention economic loss. But it does limit coverage to "property damage" suits. Given the extensive jurisprudence separating property damage from economic loss, we cannot presume this policy was drafted

**2.** 557 S.W.2d 77, 80 (Tex.1977) ("The courts of civil appeals have correctly reasoned that economic loss is not 'physical harm' to the user or his property.... We agree and hold that strict liability does not apply to economic losses.").

**3.** 711 S.W.2d 617, 618 (Tex.1986) (citations omitted). For a description of the defects the Reeds asserted, *see Jim Walters Homes, Inc. v. Reed*, 703 S.W.2d 701, 705 (Tex.App.-Corpus Christi 1985), *aff'd in part and rev'd in part*, 711 S.W.2d 617 (Tex.1986).

**4.** *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 884–85, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (applying federal maritime law); Robert A. Sachs, *Product Liability Reform and Seller Liability: A Proposal for Change*, 55 BAYLOR L.REV. 1031, 1115 n. 372 (2003) ("Property damage to the product itself and consequential economic losses to the owner of the product are considered in most states to be recoverable under the law governing commercial transactions and the Uniform Commercial Code, not under tort law.") (citing cases).

**5.** RESTATEMENT (THIRD) OF TORTS § 21 (1998) (emphasis added).

**6.** RESTATEMENT (THIRD) OF ECONOMIC TORTS AND RELATED WRONGS § 8 cmt. c(2) (Council Draft No. 1, 2006).

**7.** *Id.* § 8 cmt. C(3), illus. 12:

> Contractor negligently compacts fill dirt upon which it builds a house. Contractor sells the house to A who later sells the house to B. Noticing a crack in the house's slab, B's Broker asks Engineer to inspect the foundation on behalf of B before B contracts to buy the house. Engineer gives the house a clean bill. When the crack worsens and other problems develop B discovers the fill was improperly compacted. B sues Contractor and Engineer. The house, foundation, and fill are considered to be part of an integrated whole so the harm to the house resulting from the defect in the fill is a pure economic loss. There is no negligence action for the harm....

without knowing or recognizing the difference.

Nor is the difference between property damage and economic loss claims merely a technical rule of pleading. While warranty claims generally pass to new buyers,[8] property damage claims do not, remaining with the party that owned the property when the tort occurred.[9] Here, the homebuyers alleged Lamar Homes failed to design, construct, and market their foundation properly, actions that all took place before the sale. Thus, they brought warranty claims because they *had* to, having no standing to assert a property damage claim.

Lamar Homes points out that the CGL policy doesn't define "property damage" as physical injury to the tangible property *of others*, and thus argues it should cover property that was defective when Lamar Homes sold it. But like all liability policies, this policy covers only third-party claims, not first-party claims. By limiting coverage to property damage claims asserted against Lamar Homes, the policy necessarily covered only property owned by a third party at the time it was damaged.

The Court relies on the subcontractor exception to the your-work exclusion to find coverage. This is a mistake for a simple reason: exclusions cannot create coverage. While an exception to an exclusion preserves any coverage that may exist, it cannot create coverage on its own.[10] Lamar Homes errs in asserting that this exception to an exclusion "represents a major extension of coverage"; extensions of coverage must be found in the policy's coverage provisions, not its exclusions. By finding coverage based on an exception to an exclusion, the Court now has the policy's tail wagging the dog.

I agree the subcontractor exception creates something of an anomaly when used in the construction industry. For several policy reasons, it has long been understood that CGL insurance does not cover damage to an insured's own work.[11] But be-

**8.** *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 88 (Tex. 2004).

**9.** *See Vann v. Bowie Sewerage Co.*, 127 Tex. 97, 90 S.W.2d 561, 562 (Tex.1936); *Cook v. Exxon Corp.*, 145 S.W.3d 776, 781 (Tex.App.-Texarkana 2004, no pet.); *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 732 (Tex.App.-Texarkana 2003, no pet.); *Exxon Corp. v. Pluff*, 94 S.W.3d 22, 27 (Tex.App.-Tyler 2002, pet. denied); *Senn v. Texaco, Inc.*, 55 S.W.3d 222, 225 (Tex.App.-Eastland 2001, pet. denied); *Abbott v. City of Princeton*, 721 S.W.2d 872, 875 (Tex.App.-Dallas 1986, writ ref'd n.r.e.); *Lay v. Aetna Ins. Co.*, 599 S.W.2d 684, 686 (Tex.Civ.App.-Austin 1980, writ ref'd n.r.e.).

**10.** *See Harken Exploration Co. v. Sphere Drake Ins. P.L.C.*, 261 F.3d 466, 471 (5th Cir.2001) ("The insured bears the initial burden of showing that the claim against her is potentially within the insurance policy's scope of coverage.") (citations omitted); *see also Kvaerner Metals Div. of Kvaerner U.S., Inc. v.*

*Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 899–900 (2006) (finding it unnecessary to consider policy exclusions when there was no "occurrence" under the CGL); *Auto-Owners Ins. Co. v. Home Pride Cos.*, 268 Neb. 528, 684 N.W.2d 571, 576 (2004) ("[T]he exception contained within exclusion '1' is irrelevant until ... [t]here is an initial grant of coverage...."); *Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77, 81 (2001) ("Before any coverage can be found to exist under ... any other portion of the commercial general liability policy, an 'occurrence,' within the policy definition of that term, must be determined to have occurred.") (footnote omitted).

**11.** *See, e.g.,* Stewart Macaulay, *Justice Traynor and the Law of Contracts*, 13 Stan. L.Rev. 812, 825–26 (1961):

Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control

cause construction today is often entirely the work of subcontractors,[12] the subcontractor exception has effectively rendered the CGL policy's your-work exclusion meaningless when issued to a general contractor. I would not compound the confusion by allowing it to render the policy's coverage provisions meaningless as well.

It is true that if the subcontractor exception preserves only claims that no homebuyer could ever bring, it is hard to see why it was added. But that is not the case here. The insurer concedes the exception preserves coverage for damages by or to work done by subcontractors that the insured causes *after* the sale, such as during a repair call or while working on a neighboring property. Once title to the home has passed, any damage a builder causes thereafter would give the buyers a claim

for property damage rather than economic loss. Lamar Homes complains that such accidents are not very likely, and thus its CGL policy would not cover very much. But of course the policy did not cost very much, and still covers all bodily injuries and property damage (other than the house itself) that might occur after the sale. Had these same construction defects cracked a grand piano or someone's head (rather than the home's own walls), Lamar Homes would undoubtedly feel differently about its value.

Finally, the Court's opinion obscures the fact that we are adopting a minority view. The high courts of only 5 states have taken the same view as the Court,[13] a number the Court inflates by including cases in which "property damage" was not contested on appeal,[14] coverage was limited to

and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap. Replacement and repair losses tend to be more frequent than losses through injury to other property, but replacement and repair losses are limited in amount since the greatest loss cannot exceed the cost of total replacement. If the insured will stand these losses, insurance can be provided more cheaply since the company will be freed from administering many small claims for repairs, and it can set a rate for the more unusual risk of injury to property other than the contractor's work or product. This risk can be the hazardous one since there are no natural limitations on the damage the contractor might do to a homeowner's or a neighbor's property.

12. *See* Ronald J. Mann, *The First Shall be Last: A Contextual Argument for Abandoning Temporal Rules of Lien Priority*, 75 TEX. L.REV. 11, 25 (1996) ("Usually much of the work of actual construction will be provided by a general contractor through one or more tiers of subcontractors."); *see, e.g., Lennar Corp. v. Auto–Owners Ins. Co.*, 214 Ariz. 255, 151 P.3d

538, 541 (Ariz.Ct.App.2007) (noting that builder of 105 homes subcontracted all actual construction work); *see also* BLACK'S LAW DICTIONARY 351 (8th ed.2004) ("general contractor. One who contracts for the completion of an entire project, including purchasing all materials, hiring and paying subcontractors, and coordinating all the work.").

13. *See Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302 (Tenn.2007); *Am. Family Mut. Ins. Co. v. Am. Girl*, 268 Wis.2d 16, 673 N.W.2d 65 (2004); *Corner Constr. Co. v. U.S. Fidelity & Guar. Co.*, 638 N.W.2d 887 (S.D.2002); *Fejes v. Alaska Ins. Co., Inc.* 984 P.2d 519 (Alaska 1999); *High Country Assoc. v. New Hampshire Ins. Co.*, 139 N.H. 39, 648 A.2d 474 (1994).

14. *See Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 137 P.3d 486, 495 (2006) (noting insurer "only petitioned for review on the occurrence issue"); *Wanzek Constr., Inc. v. Employers. Ins.*, 679 N.W.2d 322, 327 (Minn.2004) (noting insurer did not contest that claim was an "occurrence" resulting in "property damage"); *McKellar Dev. v. N. Ins. Co.*, 108 Nev. 729, 837 P.2d 858 (1992) (failing to address whether claim involved an "accident" or "property damage").

property *other than* the builder's work,[15] or that have nothing to do with home builders.[16] By contrast, the courts of 11 states have held the CGL policy does not cover property damage to the home the insured built;[17] while the policies in some of these cases did not contain a subcontractor's exception, that is relevant only if exclusions can create coverage. Given the ubiquity of this policy nationwide, uniform treatment in the courts is important; while it is too late for complete uniformity, we should try not to make matters worse. The current lack of uniformity does not, of course, render the policy ambiguous; a policy does not have two reasonable interpretations just because the courts cannot agree on one.[18]

Lamar Homes was sued for breaking promises, not for breaking property. Indeed, under Texas law that is the only claim the homebuyers could possibly bring. Because their injuries occurred when the sale took place (though the cracks appeared five years later), they did not have a property damage claim under Texas law. Because that is all this CGL policy covered, I would answer the second certified question "No." As this question disposes of the pending claim, I would decline to decide the others.[19]

## ON MOTION FOR REHEARING

Justice BRISTER, joined by Justice HECHT and by Justice WILLETT, dissenting.

Since Reconstruction, prompt-payment penalties applied to some insurance claims in Texas, but never to a liability carrier's duty to defend.[1] Now the Court discovers the Legislature accidentally changed all that when it tinkered with the statute in 1991, although no one apparently recognized it at the time. Nor could anyone have done so, as the three words the Legislature added in 1991 ("first-party claim") have never been used by anyone familiar with the insurance business to refer to the duty to defend.

15. *See French v. Assurance Co. of Am.*, 448 F.3d 693, 706 (4th Cir.2006) (predicting Maryland courts would find no coverage for repairing defective work, but would find coverage for damage to other parts of home).

16. *See Ferrell v. West Bend Mut. Ins. Co.*, 393 F.3d 786 (8th Cir.2005); *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555 (3d Cir.2001) (predicting New Jersey courts would find coverage for claim against supplier of boom installed on cargo vessel).

17. *See Burlington Ins. Co. v. Oceanic Design & Constr. Inc.*, 383 F.3d 940, 948–49 (9th Cir.2004) (predicting Hawaii courts would find no coverage); *Travelers Indem. Co. v. Miller Bldg. Corp.*, 97 FED. APPX. 431, 434 (4th Cir.2004) (predicting North Carolina courts would find coverage only to extent defects damage carpet supplied by owner, not builder); *ACUITY v. Burd & Smith Const., Inc.*, 721 N.W.2d 33, 39 (N.D.2006); *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888, 899–900 (2006); *L-J, Inc. v. Bituminous Fire & Marine Ins. Co.*, 366 S.C. 117, 621 S.E.2d 33,

36–37 (2005); *Auto–Owners Ins. Co. v. Home Pride Cos.*, 268 Neb. 528, 684 N.W.2d 571, 577 (2004); *Corder v. William W. Smith Excavating Co.*, 210 W.Va. 110, 556 S.E.2d 77, 82 (2001); *Pursell Constr. Inc. v. Hawkeye–Security Ins. Co.*, 596 N.W.2d 67, 70 (Iowa 1999); *Commerce Ins. Co. v. Betty Caplette Builders, Inc.*, 420 Mass. 87, 647 N.E.2d 1211, 1214 (1995); *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 378 (Okla.1991); *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me.1989).

18. *See City of Keller v. Wilson*, 168 S.W.3d 802, 828 (Tex.2005) ("It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about.").

19. *See, e.g., Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 434 (Tex.2005).

1. *See State Farm Life Ins. Co. v. Martinez*, 216 S.W.3d 799, 803 (Tex.2007) (citing statutes).

I would not have reached this question in this case, as the builder's claim here was never one for "property damage" and thus is not covered. But because the Court's answer to this question strays far beyond what anyone in the Legislature could have intended or even foreseen in 1991, I respectfully dissent to the Court's denial of rehearing.

The Texas prompt-payment statutes have never applied to all insurance claims. The 1874 statute (passed shortly after Governor Richard Coke took over the Capitol from former Governor Edmund J. Davis)[2] applied only to life insurance.[3] The 1909 statute (effective for the next 82 years) covered only life, accident, and health insurance claims, though its effort to detail every possible combination thereof made the statute hard to read:

> In all cases where a loss occurs and the life insurance company, or accident insurance company, or life and accident, health and accident, or life, health and accident insurance company liable therefor shall fail to pay the same within thirty days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of the loss, twelve per cent dam-

ages on the amount of such loss together with reasonable attorney fees.[4]

In 1991, the Legislature recodified the statute, raised the interest rate, and omitted the cumbersome list of covered insurance companies:

> In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable to pay the holder of the policy ... 18 percent per annum of the amount of such claim as damages, together with reasonable attorney fees.... [5]

But in committee hearings on the proposed bill, objections were raised that this language, without more, could be interpreted to apply even to third-party claims and the duty to defend.[6] Accordingly, before final passage the following definition was added to the bill to limit the statute's coverage:

> "Claim" means a first-party claim made by an insured or a policyholder under an insurance policy or contract or by a beneficiary named in the policy or contract that must be paid by the insurer directly to the insured or beneficiary.[7]

---

2. *See* 2 The New Handbook Of Texas 195 (Ron Tyler et al. eds., 1996).

3. Act approved May 2, 1874, 14th Leg., R.S., ch. 145, § 9, 1874 Tex. Gen. Laws 197, 200.

4. Act of Mar. 22, 1909, 31st Leg., R.S., ch. 108, § 35, 1909 Tex. Gen. Laws 192, 204. Although amended in 1931 and in 1951, the language remained almost identical to the 1909 statute. *See* Act of Apr. 27, 1931, 42d Leg., R.S., ch. 91, § 1, 1931 Tex. Gen. Laws 135; Act approved June 28, 1951, 52d Leg., R.S., ch. 491, art. 3.62, 1951 Tex. Gen. Laws 868, 920.

5. Act of May 2, 1991, 72d Leg., R.S. ch. 242, § 11.03(a), 1991 Tex. Gen. Laws 1043, 1045 (currently codified as Tex. Ins.Code §§ 542.058, 542.060).

6. *See* Tex. H.B. 2, 72d Leg., R.S. (1991) (as introduced); *Formal Meeting on Tex. H.B. 2 Before the House Comm. on Insur., Subcomm. on H.B. 2*, 72d Leg., R.S. (March 12, 1991) (statement of Robert Sneed, Texas Ass'n of Life Ins. Officials & Tex. Land Title Ass'n) (Tape 1, Side 2, available from the House media office) (explaining, using title and malpractice insurance as examples, that "[t]he obligation of the insurer is to indemnify and defend.... Now that cannot be accomplished within the 30–day period. It's very difficult to try to handle this other than to separate it.").

7. Act of May 2, 1991, 72d Leg., R.S., ch. 242, § 11.03(a), 1991 Tex. Gen. Laws 1043 (currently codified as Tex. Ins.Code § 542.051(2)).

Given this sequence of events, reasonable minds cannot possibly conclude that legislators intended the 1991 changes to extend the prompt-payment statute for the first time to a liability insurer's duty to defend.

While the 1991 statute did not include a more specific definition of "first-party claim," there is no question what "first-party" and "third-party" mean when the subject is "an insurance policy or contract." As the Court concedes, liability policies have always been considered "third-party" policies, while "first-party" has traditionally referred to life, accident, or health claims in which the initial loss was suffered by the insured rather than someone else.[8]

That being the case, the Code Construction Act specifically instructs us to apply the technical or particular meaning customarily used with respect to insurance policies:

> Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.[9]

We cannot adopt a definition of "first-party claim" that those in the insurance industry would not recognize.

We would have to reach the same result were we to look to the Insurance Code as a whole, as the Court also concedes we must do.[10] This is not the only time "first-party claim" appears in the Code. It also appears in the Property and Casualty Insurance Guaranty Act,[11] which clearly does not intend "first-party claims" to include liability policies because it lists them separately:

> "Claimant" means an insured making a first-party claim *or* a person instituting a liability claim.[12]

This provision limits coverage of the Act to the indemnity part (and not the duty-to-defend part) of a third-party policy; elsewhere, the Act expressly authorizes the guaranty association to undertake (rather than reimburse) any duty to defend,[13] and expressly excludes claims for attorney's fees.[14] By redefining the duty to defend as a first-party claim, the Court has undermined the Legislature's design of the Guaranty Act as well.

The Court's definition of "first-party claim" is also at odds with the use of this term in the courts. Courts around the nation uniformly refer to the duty to defend as a "third-party claim."[15] This

---

8. 242 S.W.3d at 17.

9. Tex. Gov't Code § 311.011(b).

10. 242 S.W.3d at 19.

11. *See* TEX. INS.CODE §§ 462.004(4), 462.201, 462.254(b).

12. *Id.* § 462.004(4) (emphasis added).

13. *Id.* § 462.306(a) ("The association shall discharge an impaired insurer's policy obligations, including the duty to defend insureds under a liability insurance policy, to the extent that the policy obligation is a covered claim under this chapter.").

14. *Id.* § 462.302(c) ("The association is not liable for any other claim or damages against

... an impaired insurer ... including a claim for: (1) recovery of attorney's fees....").

15. *See, e.g., Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 951 (9th Cir.2002) ("Reliance on cases construing first-party indemnity insurance policies is thus misplaced when evaluating the defense duty."); *A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 676 n. 8 (4th Cir.1986) ("An insurer's first-party insurance obligation is its duty to compensate the insured for direct losses within the policy coverage. An insurer's third-party insurance obligation is its duty to defend the insured against claims by another, injured party and to indemnify the insured for losses sustained through such claims."); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 421 (Colo.1991) ("When the benefit derives from the insurer's

Court has routinely referred to liability policy claims as arising in a "third-party context."[16] The same year the Legislature amended the prompt-payment statute, the Fourteenth Court of Appeals held that non-lawyers could represent clients in presenting "first-party claims" to insurers,[17] something they surely could not do if the term includes the duty to defend. Even when we have held first-party and third-party claims should be treated the same, we have never before suggested that the two terms overlap.[18]

The common custom and usage of "first-party claim" would of course have to yield if the prompt-payment statute defined it otherwise. But three accompanying parts of the statutory definition explicitly prove that it does not.

First, the statute applies only to claims "that must be *paid* by the insurer."[19] First-party insurers promise to pay life, auto, or health claims, but liability insurers promise only to defend. One can imagine first-party "litigation insurance" that promises to pay an insured for all its litigation costs, but this is not such a policy.

This policy promises services, not payment. As its name implies, the prompt-payment statute is limited to insurance claims that must be paid.

Second, claims for reimbursement like the one here are not claims "under an insurance policy or contract,"[20] but a damages claim for breach of contract. Under most liability policies, it is entirely up to the insurer how much it will pay for defense, as it picks the attorney and controls the litigation.[21] Insurers commonly negotiate lower rates with lawyers and law firms in return for frequent business. By contrast, if an insurer wrongfully refuses to defend, it must reimburse reasonable and necessary fees under contract law—an amount often substantially higher than what it would pay "under the policy." Unless the builder's counsel here has agreed to accept the insurer's standard rates, this suit is for something more than payment "under the policy."

Third, the statute applies only to claims "that must be paid by the insurer directly to the insured."[22] An insured whose home has been damaged by wind or fire may

---

duty to defend the insured against third-party actions, that relationship is characterized as a 'third-party claim.'").

**16.** *See, e.g., Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.,* 236 S.W.3d 765 (Tex.2007) ("[Liability insurer] adds that its only common law duty to [insured] in this third party context was the *Stowers* duty...."); *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 260 (Tex.2002) ("Nor can we identify a principled basis upon which to draw a distinction between first-party and third-party claims when the insured has been directly injured as a result of its insurer's unfair claim settlement practices."); *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 53 n. 2 (Tex.1997) ("We recently declined to extend the bad-faith cause of action to the third-party context, in which an insured seeks coverage for injuries to a third party.") (citation omitted); *Tex. Farmers Ins. Co. v. Soriano,* 881 S.W.2d 312, 317 (Tex.1994) ("Significantly,

each of these cases involves the insurer's duty to its insured in handling first-party claims. We have never held and do *not* hold today that either of these two standards applies to insurers in responding to third-party claims.") (emphasis in original).

**17.** *Unauthorized Practice of Law Comm. v. Jansen,* 816 S.W.2d 813 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

**18.** *See, e.g., Rocor Int'l,* 77 S.W.3d at 260.

**19.** Tex. Ins.Code § 542.051(2)(b) (emphasis added).

**20.** *Id.* § 542.051(2)(a).

**21.** *See N. County Mut. Ins. Co. v. Davalos,* 140 S.W.3d 685, 688 (Tex.2004).

**22.** Tex. Ins.Code § 542.051(2)(b).

demand direct payment under a first-party policy, or may ask the insurer to forward payment to repairmen. But under a third-party liability policy, an insured cannot demand that defense costs be paid to it directly; how defense costs are paid is entirely up to the insurer. This is hardly "a distinction without a difference" as the Court says; [23] the statute is explicitly limited to claims that a policy requires "*must* be paid by the insurer directly to the insured." [24]

Furthermore, the very operation of the statute precludes applying it to the duty to defend here. The prompt-payment statutory deadlines only begin to run from the date "the insurer receives all items, statements, and forms required by the insurer, in order to secure *final* proof of loss." [25] Obviously, there can be no final proof of loss under a liability policy until the underlying case is settled or adjudicated. Without explanation, the Court simply decrees that final proof of loss is unnecessary: the deadlines now run seriatim as each legal bill is received by the carrier.[26] This is liberal creation, not liberal construction.

. Nevertheless, the Court says we must entirely separate first-party *claims* from first-party *insurance,* even though neither the Insurance Code nor this Court have ever made such a distinction. The Court gives only two reasons.

First, the Court says we must do so because this "*more accurately reflects the Legislature's purpose* for enacting the prompt-payment statute." [27] In other words, the test for a "first-party claim" is whether penalty interest would encourage insurers to pay faster. This of course proves too much—insurers would probably pay rent, property taxes, and their own contents insurance faster if penalty interest applied, but that does not make any of these a "first-party claim."

Second, the Court says we must focus on whether the claim is for "the insured's own loss." [28] But this again proves too much. At the moment an insurer rejects coverage under a liability policy, the insured has suffered no loss; it simply may have to pay things (defense costs or a judgment) in the future. If an insured suffers its "own loss" by paying defense costs, surely it would do the same when it pays the underlying claim. Thus, by the Court's logic an insured can convert *everything* in a third-party policy into a "first-party claim" by simply paying it. This effectively strikes "first-party claim" completely from the statute.

Recognizing as much, the Court attempts to fix this last problem by adding something else to the prompt-payment statute that it does not contain. The Court redefines "first-party claim" to include only those that are "in no way derivative of any loss suffered by a third party." [29] And where is this in the Insurance Code? Nowhere. We cannot simply make these things up as we go along.

For its novel, even revolutionary distinction between first-party claims and first-party insurance, the Court has a single citation to Texas law—a footnote in a plurality opinion in *Universe Life Ins. Co. v.*

23. 242 S.W.3d at 18.

24. Tex. Ins.Code § 542.051(2)(b) (emphasis added).

25. *Id.* § 542.056(a) (emphasis added).

26. 242 S.W.3d at 19.

27. *Id.* at 17.

28. *Id.* at 17.

29. *Id.* at 17.

*Giles.*[30] But there are big problems with the Court's logic here.

First, the plurality opinion in *Giles* made no distinction between first-party claims and first-party insurance. To the contrary, the *Giles* plurality used the two interchangeably:

> We are in the mainstream in recognizing a bad-faith tort in the context of *first-party claims* .... Only four state courts of last resort have rejected a tort of bad faith in *first-party insurance* cases.[31]

Far from considering "first-party claims" and "first-party insurance" to be distinct, the plurality in *Giles* obviously considered them to be identical.

Second, *Giles* concerned the boundaries of a bad-faith tort, a common-law claim as to which courts generally define terms as they see fit. We cannot do the same with statutes. No matter how we might define "first party" for our own purposes, the question here is only what the Legislature meant.

Third, the Court's opinion apparently reverses the one point of unanimous agreement in *Giles*—that the tort of bad faith does not apply to claims under a liability insurance policy.[32] In *Maryland Insurance Co. v. Head Industrial Coatings and Services, Inc.*, the court of appeals had found this tort applies to all insurance claims, as an insured faces unequal bargaining power whether a loss was initially its own (a first-party claim) or someone else's (a third-party claim).[33] We reversed, holding the tort did not apply to third-party claims because insureds are sufficiently protected by an insurer's *Stowers* duty.[34] *Stowers*, of course, applies to the duty to indemnify but not the duty to defend. As the Court holds the duty to defend is a first-party claim, and as *Stowers* does not apply, it is hard to see how *Maryland Insurance* and the unanimous part of *Giles* survive.

There are many differences between first-party and third-party claims. For one thing, a duty-to-defend claim is construed more broadly than any other insurance claim, as courts tend to apply it not only to covered claims but to potentially covered claims or even claims that are merely artfully pleaded.[35] It is hard to foresee all the consequences that may follow from the Court's effort in this case to mix them together.

Perhaps it is a good idea to penalize insurers that refuse to defend a claim like the one here—one that most state courts have held the standard CGL policy does not cover. But this is a decision for the people of Texas to make through legislative proposals and debate, not for this Court to make out of whole cloth. Because the Court gives the prompt-payment statute a "plain meaning" that would have been news to any legislators reading it when it was passed, I respectfully dissent.

---

**30.** 950 S.W.2d 48, 54 n. 2 (Tex.1997).

**31.** *Id.* at 52–53 (emphasis added).

**32.** *See id.* at 60 (Hecht, J., concurring in judgment).

**33.** 906 S.W.2d 218, 226 (Tex.App.-Texarkana 1995), *rev'd*, 938 S.W.2d 27 (Tex.1996) (per curiam).

**34.** 938 S.W.2d at 28–29; *see also G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App.1929, holding approved).

**35.** *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310–11 (Tex. 2006).