**THOS. S. BYRNE, LTD. f/k/a Thos. S. Byrne, Inc., Appellant,**

v.

**TRINITY UNIVERSAL INSURANCE COMPANY, Trinity Lloyds Insurance Company, and Transcontinental Insurance Company, Appellees.**

No. 05–07–01255–CV.

Court of Appeals of Texas, Dallas.

Dec. 4, 2008.

Rehearing Overruled Nov. 3, 2009.

Kevin J. Keith, Hiersche, Haywward, Drakely & Urbach, P.C., Addison, for Appellant.

Kevin Michael Murphy, Claudia K. Frey, Colliau, Elenius, Murphy, Carluccio, Kenner & Morrow, Dallas, Lisa Dean Hull, Harrison & Hull LLP, McKinney, for Appellees.

Before Justices FITZGERALD, RICHTER, and LANG–MIERS.

## OPINION

Opinion by Justice FITZGERALD.

Appellant Thos. S. Byrne, Ltd. sued appellees for a judgment declaring that they owed Byrne a duty to defend in connection with a separate underlying lawsuit. The trial court granted summary judgment in favor of appellees, concluding that they

owed Byrne no duty to defend or indemnify. We reverse and remand.

## I. BACKGROUND

### A. Facts

Maple Villas, L.P. decided to build an apartment complex. It financed the construction by borrowing $22.6 million from Mercantile Safe Deposit & Trust Co. in 1996. Mercantile also retained an option to purchase the complex. In 1997, Maple Villas hired appellant Thos. S. Byrne, Ltd. as general contractor on the construction project. Byrne hired numerous subcontractors to build the apartment complex. Those subcontractors included Subfloor Systems, Inc., which was responsible for installing concrete flooring in the complex, and Sam White Investments d/b/a S.W.I. Lathe & Plastering, which was responsible for installing stucco on the complex's walls.

Subfloor obtained commercial general liability ("CGL") insurance from appellee Trinity Universal Insurance Company for the period of May 2, 1997 through May 2, 1998, and from appellee Trinity Lloyds Insurance Company for the period of May 2, 1998 through May 2, 1999. Byrne alleges that it was an additional insured on Subfloor's policies by virtue of automatic additional insured endorsements. S.W.I. obtained CGL insurance from appellee Transcontinental Insurance Company. Transcontinental issued one policy that was in effect from September 25, 1997 through September 25, 1998, and another policy that was in effect from September 25, 1998 through September 25, 1999. Byrne alleges that it was an additional insured on S.W.I.'s policies by virtue of additional insured endorsements.

Construction was substantially completed by approximately April 1999. Mercantile exercised its option and purchased the complex in June 1999. In November 2001, Mercantile sued Byrne, Maple Villas, and several other defendants (but not S.W.I. or Subfloor), alleging that the complex suffered from substantial construction and design defects. Most of Mercantile's allegations concerned water infiltration and resulting damage from various causes that included a leaky roof and improperly installed windows, stucco, and concrete flooring. Mercantile pleaded the discovery rule as a ground for avoiding the statute of limitations. Byrne demanded a defense in the *Mercantile* lawsuit from its subcontractors' insurance carriers, including Trinity Universal, Trinity Lloyds, and Transcontinental.

### B. Procedural history

When the subcontractors' insurance carriers failed to tender a defense to Byrne, Byrne sued several of those carriers, including appellees. Byrne sought declarations that it was an additional insured under the carriers' policies and that the carriers owed Byrne the duty of providing a defense in the *Mercantile* lawsuit. Byrne also sued the carriers for damages under the prompt payment statute, former article 21.55 of the Texas Insurance Code.

Each appellee filed a traditional motion for summary judgment as to all of Byrne's claims. Trinity Lloyds and Trinity Universal (collectively "Trinity") filed separate but substantively identical motions raising the following grounds:

- Trinity owed no duty to defend because Mercantile's live pleading demonstrated on its face that any potentially covered property damage occurred after the Trinity policy periods, after the work was completed and put into use, or both.

- Because Trinity owed Byrne no duty to defend, it also owed Byrne no duty to indemnify.

• Byrnes's claim under article 21.55 was invalid because (1) an article 21.55 claim cannot be predicated on a breach of a duty to defend, and alternatively (2) Trinity owed Byrne no duty to defend.

Transcontinental asserted essentially the same arguments in its summary judgment motion, plus a no evidence argument that Byrne was not, under any circumstances, an additional insured under its 1998–1999 policy because that policy required a written contract between Byrne and the named insured, S.W.I., and Byrne could present no evidence that such a written contract existed. The trial court granted each appellee's motion, declaring that appellees owed Byrne no duty to defend or indemnify and ordering Byrne to take nothing on its claims under the prompt payment statute. The litigation continued against the other carriers until all of Byrne's claims had been disposed of by summary judgment or nonsuit. Byrne appealed after the last order of dismissal was signed.

### C. Issues on appeal

Byrne raises five issues. In three issues it generally challenges the trial court's summary judgment orders in favor of appellees. In its fourth issue, Byrne argues that the trial court erred by granting summary judgment against it on its claim under the prompt payment statute. And in its fifth issue, Byrne argues that the trial court erred by declaring as a matter of law that appellees owe Byrne no duty to indemnify as well as no duty to defend.

## II. DUTY TO DEFEND—WHEN THE PROPERTY DAMAGE OCCURRED

### A. Standard of review

We review a traditional summary judgment de novo. *Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 805 (Tex.App.-Dallas 2008, pet. denied). The trial court properly grants a defendant's traditional motion for summary judgment if the movant conclusively disproves an essential element of its opponent's claim or conclusively proves all of the elements of an affirmative defense. *Henson v. Sw. Airlines Co.*, 180 S.W.3d 841, 843 (Tex.App.-Dallas 2005, pet. denied). We consider the evidence in the light most favorable to the nonmovant and resolve all doubts in the nonmovant's favor. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005).

### B. The eight corners rule

All parties agree that this issue is governed by the familiar eight corners rule. The rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third party claimant. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex.2006). Under that rule, we determine whether a liability insurer has a duty to defend by comparing the allegations within the four corners of the claimant's pleadings to the language within the four corners of the insurance policy. *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). If the claimant's factual allegations potentially support a covered claim, the insurer must defend its insured. *GuideOne Elite Ins. Co.*, 197 S.W.3d at 310. We give the allegations in the petition a liberal interpretation in favor of the insured. *Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 643 (Tex.2005); *Gehan Homes, Ltd. v. Employers Mut. Cas. Co.*, 146 S.W.3d 833, 838 (Tex.App.-Dallas 2004, pet. denied). If the pleading "does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially,

a case under the [pleading] within the coverage of the policy." *Merchs. Fast Motor Lines,* 939 S.W.2d at 141. In other words, if there is doubt as to whether the claimant has pleaded a cause of action within coverage, the doubt is resolved in favor of the insured, and the insurer must defend. *Id.*

### 1. *The insurance policies*

The Trinity and Transcontinental policies are identical in the following respects. All four policies cover "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." They further provide that the insurance applies to bodily injury and property damage only if "[t]he 'bodily injury' or 'property damage' occurs during the policy period." As relevant to this case, the policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." The policies do not define "occur" or "occurs."

Each Trinity policy contains an automatic additional insured endorsement that makes Byrne an insured, but only with respect to liability arising from Subfloor's work for Byrne. The endorsement also contains a potentially relevant exclusion. Per that exclusion, the insurance does not apply to bodily injury or property damage that occurs after:

(a) All work on the project (other than service, maintenance or repairs) to be performed by or on behalf of the Additional Insured(s) at the site of the covered operations has been completed; or

(b) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing oper-

ations for a principal as a part of the same project.

Thus, Byrne is entitled to a defense from Trinity if Mercantile's pleading potentially supports a recovery against Byrne for property damage that arose from Subfloor's work, that occurred during the policy periods, and that occurred before all work was completed and before the work was put to its intended use.

The Transcontinental insurance policies contain additional insured endorsements that are slightly different from the Trinity endorsements. In the Transcontinental policy in effect from 1997–1998, the endorsement provides that Byrne is an additional insured with respect to liability arising out of S.W.I.'s work for Byrne. In the 1998–1999 policy, the endorsement provides that Byrne is an additional insured "only with respect to liability arising out of [S.W.I.'s] ongoing operations performed for" Byrne. Thus, Byrne is entitled to a defense from Transcontinental if Mercantile's pleading potentially supports a recovery against Byrne for property damage that occurred during the policy period and either arose from S.W.I.'s work (during the 1997–1998 policy) or S.W.I.'s "ongoing operations" (during the 1998–1999 policy).

### 2. *When does property damage "occur"?*

The question presented is how to interpret a CGL policy that provides coverage for claims for property damage that "occurs during the policy period." For years, courts have struggled with this issue in duty to defend cases in which the underlying claimant alleges that the property damage was not discoverable for some time (often to address limitations problems). The Texas Supreme Court recently resolved the issue. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.,* 267 S.W.3d 20 (Tex.2008). After surveying Texas juris-

prudence, the *Don's Building Supply* court noted that this Court was among those courts holding that the duty to defend is triggered only if the damage allegedly became manifest or apparent during the policy period. *Id.* at 27 n. 23 (citing *Summit Custom Homes, Inc. v. Great Am. Lloyds Ins. Co.*, 202 S.W.3d 823, 827 (Tex. App.-Dallas 2006, no pet.), *disapproved in part on other grounds by Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 16–20 (Tex.2007); *Cullen/Frost Bank of Dallas, N.A. v. Commonwealth Lloyd's Ins. Co.*, 852 S.W.2d 252, 258 (Tex. App.-Dallas 1993), *writ denied per curiam*, 889 S.W.2d 266 (Tex.1994); *Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737 S.W.2d 380, 381, 383 (Tex.App.-Dallas 1987, no writ)). But, focusing on the plain language of the CGL policy before it, the supreme court adopted a different, common sense rule: "[W]e hold that property damage under this policy occurred when actual physical damage to the property occurred.... The date that the physical damage is or could have been discovered is irrelevant under the policy." *Id.* at 24; *accord Union Ins. Co. v. Don's Bldg. Supply, Inc.*, 266 S.W.3d 592, 594–95 (Tex. App.-Dallas 2008, pet. filed) (applying actual injury rule instead of manifestation rule).

The relevant policy language in this case is identical to the policy language in *Don's Building Supply,* so we must apply the rule announced in that case. To the extent the policies involved in *Summit Custom Homes, Cullen/Frost Bank*, and *Dorchester Development Corp.* contained the same coverage language, *Don's Building Supply* has abrogated those cases.

### 3. *The allegations in the live* Mercantile *pleading*

We next review the live pleading in the underlying lawsuit, which is Mercantile's Fifth Amended Petition, for allegations of property damage and when it occurred. Mercantile did not sue S.W.I. or Subfloor, so the petition contains relatively little information about them. Paragraphs 10 and 11, however, set up the factual background for Mercantile's claims, and paragraph 11 mentions S.W.I. and Subfloor by name in subparagraphs (iii) and (iv).

10. Plaintiff [Mercantile] recently discovered substantial and material defects in the construction and/or design of the Project, including but not limited to the roof, truss system, framing system, life and fire safety components of the apartments, the complex's exterior envelope, and other elements....

11. As a result of the design and construction deficiencies, Plaintiff had to repair numerous components of the building. These problems arose well after [Byrne] completed its operations at the property. Some defectively constructed work damaged other property and components of the complex that were not otherwise deficient, requiring their repair and replacement as well. A brief description of a few of these situations where deficient work damaged the work of other subcontractors includes:

(i) ...

(ii) Improper window installation (under the subcontract of RER Construction) caused water to infiltrate perimeter walls. This manifested as damage to the structural wood members, drywall, and finishes after completion of construction....

(iii) Improper installation of stucco (under the subcontract of S.W.I.) contributed to water entry at the windows. The window ledges were not placed under the window frames and did not slope away from the building, but many had a flat or negative slope and blocked window weeps. This contributed to the wa-

ter infiltration and resulting damages mentioned above.

(iv) Improper application of concrete flooring (under the subcontract of Subfloor Systems) also contributed to water infiltration. The concrete balconies and breezeway ends contained negative slopes and lacked adequate flashing. Water on these concrete surfaces ran behind the walls and damaged the wood framing and building interiors causing hundreds of thousands of dollars in damage.

The petition says little about when the property damage began, but Mercantile's allegations in support of its breach of contract claim against Maple Villas indicate that some water related problems had occurred before the sale to Mercantile in June 1999:

18. . . . Specifically, Maple Villas failed to disclose, *inter alia*, that (1) the Project was not designed and constructed in a good and workmanlike manner and in compliance with industry standards; (2) the Project contained roof leaks which materially affected, and would continue to affect, the rental and occupancy rates of the Project; and (3) Maple Villas had granted leak-caused rent concessions.

In the allegations specific to Mercantile's claim against Byrne for breach of contract and breach of warranty, Mercantile makes the following averments:

25. . . . The construction of the Project by [Byrne], however, was not performed in a good and workmanlike manner, in accordance with applicable building codes and ordinances, and in accordance with the plans and specifications. For example, the complex's roof had to be replaced, the roof truss system and framing systems were improperly constructed and required repairs; *the building facade experienced leaks after completion* due to improper construc-

tion; and the life and fire safety systems contained numerous construction deficiencies requiring a complete overhaul.

(Emphasis added.) Finally, Mercantile pleads the discovery rule and alleges some facts in support:

32. Plaintiff did not discover, and in the exercise of reasonable diligence could not have discovered, the seriousness of the roof leaks before late 2000, and other separate and distinct design and construction deficiencies before their discovery in 2002–2003. *Many problems did not arise or manifest themselves until several years had passed after completion.* Further, a number of problems were hidden behind finishes and other surfaces. As such, these defects were inherently undiscoverable and not objectively verifiable until consequential damages arose and removal of existing structures had occurred.

(Emphasis added.)

### 4. *Application of the eight corners rule to the facts of this case*

■ We now compare the *Mercantile* petition to the insurance policies to see whether Mercantile's factual allegations potentially support a covered claim under the various policies involved in this case. *See GuideOne Elite Ins. Co.,* 197 S.W.3d at 310.

First, we note that the petition contains no specifics about when S.W.I. and Subfloor performed their work on the project. Mercantile alleges only that it hired Byrne in 1997, that Byrne hired the subcontractors, and that the project was "substantially completed by approximately April of 1999." It alleges no facts about when S.W.I. or Subfloor performed their work, so that work potentially occurred any time from the beginning of 1997 to at least April 1999. Thus, if the petition potential-

ly supports a claim for property damage that occurred from January 1997 through April 1999 and that arose from S.W.I.'s and Subfloor's work, then the various policy requirements that the damage must have occurred before completion, before the work was put to its intended use, or during ongoing operations are also satisfied.

Next, we consider what kind of property damage Mercantile alleges S.W.I. and Subfloor caused. Paragraph 11 contains Mercantile's only specific factual allegations on the subject. First, Mercantile alleges that improper window installation by a different subcontractor, RER Construction, caused water infiltration into perimeter walls, and that "[t]his manifested as damage to the structural wood members, drywall, and finishes after completion of construction." Next, Mercantile alleges that Transcontinental's insured, S.W.I., improperly installed stucco, which "contributed to the water infiltration and resulting damages mentioned above," i.e., damage to the structural wood members, drywall, and finishes that manifested after completion of construction. Finally, Mercantile alleges that Trinity's insured, Subfloor, improperly installed the concrete floors, which "contributed to the water infiltration." Further, because Subfloor improperly installed the concrete balconies and breezeways with negative slopes and inadequate flashing, water "ran behind the walls and damaged the wood framing and building interiors." Thus, the petition is fairly straightforward: S.W.I. and Subfloor caused property damage by their defective installation of stucco and concrete floors, respectively; the mechanism of that damage was water infiltration into the complex's walls; and the nature of that damage was damage to the structural wood members, wood framing, drywall, finishes, and building interiors.

Finally, we consider whether, under Mercantile's petition, the alleged property damage potentially occurred during the 1997–April 1999 time frame during which appellees' policies provided coverage. Our decision in *Gehan Homes* is instructive. In that factually and procedurally similar case, home builder Gehan Homes was protected by an Employers Mutual Casualty Company CGL policy from 1997–1998 and by a Great American Lloyds Insurance CGL policy from 1998–1999. 146 S.W.3d at 837. Some home purchasers sued Gehan Homes in 2001 for foundation problems and "claimed that they suffered 'past' bodily injuries and property damages without identifying when in the past this occurred." *Id.* at 846. The insurers filed a separate suit against Gehan Homes seeking a declaratory judgment that they owed no duty to defend. *Id.* at 837. The policies contained the same coverage language involved in this case, limiting coverage to claims for bodily injury and property damage that occurred during the policy period. *Id.* at 845 n. 11. The insurers won summary judgment that they owed no duty to defend, and we reversed. *Id.* at 846. We held "that the insurers did not establish as a matter of law that there was no allegation of a potential occurrence [of property damage] within the policy coverage period." *Id.* The import of *Gehan Homes* is clear: if the petition is silent as to when property damage occurred but leaves open the potential that it occurred during the policy period, summary judgment for the insurer is improper.

Under *Gehan Homes*, we conclude in this case that some property damage could have occurred during the necessary time frame, and thus that the claims against Byrne are potentially covered by the policies. As in *Gehan Homes*, Mercantile is suing Byrne for property damage that began to occur some time in the past, but the time that damage started to occur is left

unclear. Read as a whole, the petition leaves open the possibility that property damage occurred during the necessary time period, just like the petition in *Gehan Homes* did. Although paragraph 11 of Mercantile's petition does not specify when the damage to the wooden structure of the building began, it says that S.W.I.'s defective installation of the stucco contributed to water infiltration, and that Subfloor's defective construction of concrete floors and balconies contributed to water infiltration and caused water to run behind the walls. It requires no speculation to recognize that the first instances of water infiltration and resulting property damage potentially occurred the first time it rained after these subcontractors started performing their work. Mercantile's allegation in paragraph 11 that "[t]hese problems arose well after [Byrne] completed its operations at the property" does not change our analysis because, in context, the word "problems" appears to mean only visible problems requiring repair, not latent property damage that could have been occurring for a long time.

Considering the specific allegations relied on by the insurers, we can immediately discount paragraphs 10 and 32 because those allegations are limited to when Mercantile discovered the property damage or when it became manifest. Under *Don's Building Supply*, those allegations are irrelevant. 267 S.W.3d at 23–25. Paragraph 18 does not conclusively establish that the property damage occurred only after the completion of construction. Indeed, Mercantile's allegation in that paragraph that Maple Villas (the predecessor owner to Mercantile) failed to disclose that

it "had granted leak-caused rent concessions" leaves open the potential that leaks caused by S.W.I.'s and Subfloor's work had been causing property damage long before the sale to Mercantile took place in June 1999. Finally, paragraph 25 does not conclusively establish that the damage referred to in paragraphs 11 and 18 could not have occurred during the coverage periods. Paragraph 25 contains a nonexclusive list of Byrne's breaches of contract and warranty: "[F]or example, the complex's roof had to be replaced; the roof truss system and framing systems were improperly constructed and required repairs; *the building facade experienced leaks after completion due to improper construction;* and the life and fire safety systems contained numerous construction deficiencies[.]" (Emphasis added.) This nonexclusive list's reference to "leaks after completion" does not conclusively negate the potential, generated by the open-ended allegations in paragraphs 11 and 18, that some leaks and resulting property damage occurred before completion as well.[1]

### 5. *Conclusion*

The *Mercantile* pleading asserts claims for property damage that potentially occurred within the coverage periods of all four insurance policies involved in this case, that allegedly arose from both S.W.I.'s and Subfloor's work, and that potentially did not come within any policy exclusions. Accordingly, appellees did not show that they were entitled to summary judgment based on the eight corners of the petition and the policies. The trial court erred by granting summary judgments declaring that Trinity Universal Insurance

---

1. Trinity makes an argument on appeal that it owes no duty to defend because Mercantile did not buy the apartment complex until June 1999 and thus could not have suffered any injury until that time—after the Trinity policies expired. We do not find this argument in

Trinity's summary judgment motions, and in any event we rejected this argument in *Union Insurance Co.*, 266 S.W.3d at 594–96. The duty to defend depends on whether the pleadings allege that damage occurred during the policy term.

Company and Trinity Lloyds Insurance Company owed Byrne no duty to defend. The trial court also erred by granting summary judgment declaring that Transcontinental Insurance Company owed Byrne no duty to defend under its policy in effect from September 25, 1997 to September 25, 1998. However, Transcontinental has an additional argument in support of its summary judgment as to its 1998–1999 policy, so we turn now to that alternative ground.

## III. Duty to Defend—Byrne's Status as Additional Insured

Transcontinental also sought a no evidence partial summary judgment that it owed Byrne no duty to defend or indemnify under its 1998–1999 policy because of policy language peculiar to that contract. Transcontinental argues that Byrne was not an additional insured under its 1998–1999 policy because (1) the policy's additional insured endorsement was triggered only if "required by written contract," and (2) Byrne could adduce no evidence that it had a written contract with S.W.I. Thus, Transcontinental argues, it owed Byrne no duty to defend under the 1998–1999 policy. Byrne relies exclusively on the eight corners rule and argues that Transcontinental cannot resort to extrinsic evidence (or the absence thereof) to defeat the duty to defend. Thus, the issue presented is whether Transcontinental was permitted to go beyond the eight corners of the policy and the petition on the narrow issue of Byrne's status as an additional insured.

We decline to reach this issue as unnecessary to our disposition of the case. We have already concluded that Transcontinental must defend Byrne against Mercantile's lawsuit under its 1997–1998 policy. That means that Transcontinental must defend Byrne against the entire lawsuit, not just against claims that arise from property damage that occurred during the

1997–1998 policy period. *See Zurich Am. Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 491 (Tex.2008) ("If a complaint potentially includes a covered claim, the insurer must defend the entire suit."); *Gehan Homes, Ltd.,* 146 S.W.3d at 838 ("A duty to defend any of the claims against an insured requires the insurer to defend the entire suit."). In the *Zurich* case, Nokia was sued in several class actions by past and future users of its wireless telephone products, based on allegations that those products cause biological injuries to users. 268 S.W.3d at 492–93. Nokia sought a defense from its various CGL insurers, and the supreme court held that it was entitled to a defense in most of those actions. One of the insurers' arguments was that Nokia was not entitled to a defense to claims brought on behalf of future users of the telephones because plaintiffs in those subclasses could not have suffered injury during past policy periods. *Id.* at 494–96. The court rejected this argument, stating, "The duty to defend is not negated by the inclusion of claims that are not covered; rather, it is triggered by the inclusion of claims that might be covered." *Id.* at 495–96. Thus, the insurers had to defend the lawsuits because some of the claims fell within the policy's coverage of "bodily injury," even though the suits "also involve[d] claims by those who have not yet purchased wireless telephones" and therefore had no bodily injury. *Id.* at 496.

*Zurich* is instructive. It holds that an insurer must defend the entire lawsuit when some claims are potentially within coverage and some are not. *Id.* at 490–92. Thus, under our holding in Part II, *supra,* Transcontinental must defend Byrne against the entire *Mercantile* lawsuit under the 1997–1998 policy. Whether Transcontinental also owes Byrne a duty under the 1998–1999 policy is not determinative under these circumstances and cannot re-

lieve Transcontinental of its obligation to defend Byrne against the entire *Mercantile* lawsuit. Because our resolution of the eight corners issue will not affect our judgment reversing the summary judgment, any opinion on the issue would be pure dictum, with all of dictum's attendant hazards. *See generally* Pierre N. Laval, *Judging Under the Constitution: Dicta About Dicta,* 81 N.Y.U. L.Rev. 1249, 1261–63 (2006) (discussing reasons that "disfavor lawmaking through dictum"). Accordingly, we decline to address the issue. *See* Tex.R.App. P. 47.1.

### IV. Duty to Indemnify

In its fifth issue, Byrne argues that the trial court erred by declaring as a matter of law that Trinity and Transcontinental owe it no duty to indemnify as to the claims in the *Mercantile* lawsuit. "[W]hen the court determines that there is a duty to defend, a ruling on the duty to indemnify is premature." *Gehan Homes, Ltd.,* 146 S.W.3d at 846. Accordingly, our conclusion that Trinity and Transcontinental owed Byrne a duty to defend under all of their policies means that the trial court's ruling on Trinity's duty to indemnify was premature and must be reversed.

### V. Prompt Payment Claim

In its fourth issue, Byrne argues that the trial court erred by granting summary judgment that it take nothing on its claims under the prompt payment statute. The supreme court has held that a liability insurer's wrongful denial of a defense can support a claim under the prompt payment statute. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.,* 242 S.W.3d 1, 20 (Tex. 2007). Our reversal of the trial court's declarations that Trinity and Transcontinental owed Byrne no duty to defend thus requires us to reverse the summary denial of Byrne's prompt payment claims as well.

### VI. Conclusion

For the foregoing reasons, we reverse the trial court's summary judgment in favor of Trinity Universal Insurance Company, its summary judgment in favor of Trinity Lloyds Insurance Company, and its summary judgment in favor of Transcontinental Insurance Company. We remand the case for further proceedings consistent with this opinion.