In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00406-CR
_____

AARON DOMONIQUE TRAYLOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 21-37571

**MEMORANDUM OPINION**

A grand jury indicted Aaron Domonique Traylor for the offense of possession of a controlled substance, phencyclidine (PCP), in an amount of four grams or more and less than two hundred grams, a second-degree felony. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d). The State also sought to enhance his punishment as a habitual offender. *See* Tex. Penal Code Ann. § 12.42(b). Traylor pled not guilty. A jury found him guilty, found the enhancements to be true, and assessed punishment

at twenty-five years of incarceration. The trial court sentenced him accordingly. In one issue, Traylor argues the trial court erred by refusing to include his requested Article 38.23 instruction in the jury charge. We affirm the trial court's judgment for the reasons discussed below.

## Background

On the night of March 4, 2021, a little after 10 p.m., Beaumont police officers Gabriel Fells and Michael Ballard were patrolling the city's north end. They testified that they observed a red Buick Encore disregard a stop sign. Fells and Ballard testified at trial that they initiated a traffic stop based on this violation.

### Officer Michael Ballard's Testimony

Ballard testified that Fells approached the driver, and Ballard approached the passenger side of the vehicle. They observed a driver, a passenger in the front of the vehicle, and another passenger in the backseat. Traylor was the backseat passenger. Ballard testified they "were on a very non-illuminated street[,]" and "couldn't really see that well."

Ballard testified that when they approached the vehicle, Traylor was "defensive, kind of in a confused-like state[.]" Ballard explained that he observed Traylor was not wearing a seatbelt, a Transportation Code violation, and asked

2

Traylor for identification. When Ballard asked for identification, Traylor immediately became defensive but said he would provide it.

Traylor then pulled a Crown Royal bag from his pant leg near his ankle, which Ballard found unusual. Ballard said the interior of the vehicle was not well lit, and "[t]he only light was coming from my flashlight or patrol unit." Ballard explained that he did not know what was inside the bag, and it was large enough to hold a weapon, which was concerning to his safety, his partner's safety, and the others inside the vehicle. Ballard then had Traylor exit the vehicle and escorted him to the front of the patrol car. Ballard explained that Traylor did not immediately respond to his lawful commands to exit the vehicle but eventually exited the vehicle. Ballard said he told Traylor to walk towards the patrol unit to get him in a well-lit area in front of their car and camera, so they could see him. Ballard noted that Traylor first walked the wrong way, but after Ballard escorted him, Traylor complied.

Ballard testified he then had Traylor place his hands on top of the bumper, so everyone could see them. Ballard then performed a permissible pat down of Traylor to check for weapons but did not check inside his pockets. While Ballard patted him down, Traylor "continued to reach towards his pockets" several times. Ballard explained he did not know if Traylor "was reaching for some sort of weapon . . . or maybe he was just intoxicated, maybe not understanding the instructions that were

3

given to him." At one point, Ballard requested consent to search Traylor's pockets, but he refused. Ballard completed the pat down and observed that Traylor exhibited signs of intoxication including bloodshot eyes, slurred speech, delayed responses, being confused and had a "thousand-yard stare[,]" which Ballard knew was a sign of drug intoxication. He also noted that there were beer bottles in Traylor's seat, and Traylor claimed he had been to the liquor store. Ballard explained he had previous contacts with Traylor, and his speech was not always slurred; it was different that night.

Ballard ran the identification, and they learned the driver had an active warrant, so they arrested him. The front seat passenger was also intoxicated. Ballard testified that because he believed Traylor and the other passenger were intoxicated, he told them that they could contact "a responsible party" to come get them. Ballard explained that when they suspect public intoxication, officers have the discretion to have someone pick the individual up, but he could have arrested Traylor and the other passenger. The other passenger's sister picked him up, but Traylor was unable to reach anyone to come get him although they let him try twice.

Ballard testified that after Traylor's second unsuccessful call, "[H]e was intoxicated in a public place without any responsible party. I believed him to be a danger to himself or possibly others. So, he was placed under arrest for public

4

intoxication." Ballard testified he had probable cause to arrest Traylor for public intoxication. Ballard said they could not release Traylor on the street, given the potential consequences if he got hurt or caused a wreck. They took Traylor into custody for public intoxication, and Ballard performed a search incident to arrest to make sure that Traylor had no contraband or weapons that he would be bringing with him into the jail. During this search, Ballard found a green package of Newport cigarettes in Traylor's front left pocket. The cigarettes caught his attention, because eleven of them "were dipped in an off-color substance that produced a strong chemical smell." Based on his experience and training, Ballard recognized the odor as PCP or phencyclidine. He also knew from his training and experience that people use PCP by dipping a cigarette and smoking it.

**Officer Fells's Testimony**

Fells testified at trial he witnessed a vehicle disregarding a stop sign at the intersection of Delaware and Gulf, which is a traffic offense. Based on that, Fells conducted a traffic stop and approached the driver's side of the vehicle. Fells explained the driver initially said he did not believe he ran the stop sign but ultimately admitted he ran the stop sign.

Fells spoke with the rear passenger, who caught his attention, because "he was irate. He was arguing with my partner." Fells explained that Traylor questioned

5

whether he had to be secured in the backseat, why he had to give identification, and disputed his detention. Fells said he educated Traylor on the law and why he was detained and "eventually gained a bit of compliance." Fells described Traylor's conduct inside the vehicle:

> His demeanor led me to be suspicious that there was something going on inside the vehicle that he didn't want me to know about. A typical person sits there, wants me to get out of their life as quickly as they possibly can, right? So they just give me their driver's license and that's it and they call it a day.
>
> Typically, when someone talks a little bit too much, gets a little irate, starts questioning what I'm doing, making furtive movements in between his feet, I'm starting to think that there was something going on in that vehicle.

Fells testified that Traylor dug around in the Crown Royal bag for longer than it should have taken him to find his identification and argued with Ballard. Fells testified his visibility was limited, but he saw Traylor reach toward his ankle area and did not know if Traylor had a weapon he could use, so officer safety was a concern.

Fells said that Ballard identified Traylor and gave him a lawful command to exit the vehicle. Fells explained that initially, Traylor questioned being asked to step out of the vehicle, and Fells responded that he was not wearing a seatbelt and was detained; Traylor went "back and forth" with Ballard for a little longer then exited the vehicle and was escorted to the front of the patrol vehicle. Fells testified that

when a person is detained like Traylor, a Terry frisk is typical, which Fells explained was "a pat down of the outer garments for any type of weapons that could, you know hurt me or anybody else."[1] Fells testified that Ballard patted Traylor down, but Traylor did not consent to search his pockets. Fells joined Ballard and saw Traylor's face. Fells testified that Traylor exhibited slurred speech, bloodshot glassy eyes, and an inability to follow simple lawful instructions like keeping his hands on the bumper.

Fells explained that they made Traylor get out of the car, but the driver stated he did not want Traylor back in the vehicle because of his behavior, so Traylor did not have a responsible party to take him, "making him in a public place." They took the driver into custody for a Jefferson County warrant, and the other passenger exhibited the same signs of intoxication as Traylor. Fells explained that in similar situations, he typically tries to find a responsible party to release the person to, but if not, he takes them to jail for their safety and the safety of others. Once he suspects someone is intoxicated, he cannot let them walk to their destination.

---

[1]*See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (After validly detaining an individual, a police officer may conduct a reasonable search for weapons for the officer's protection if the officer has reason to believe that he is dealing with an armed and dangerous individual).

7

Fells testified they gave Traylor and the other passenger an opportunity to find a responsible party to come get them, which is within the officers' discretion. The other passenger found a responsible party to pick him up. Fells said that since Traylor could not find a responsible party after a couple of attempts, they arrested him for public intoxication and performed a search incident to arrest. Fells explained this was a search of the person to make sure they are not bringing contraband or weapons into the jail and protects the suspect's personal property.

While searching Traylor incident to arrest, Ballard located cigarettes dipped in phencyclidine or PCP. Fells testified that with a dipped cigarette, "You have the white portion of the cigarette . . . Once you dip it, it turns into like a brownish, yellowish tint to it; and it also emits a chemical odor." Fells said eleven cigarettes were dipped and had a brownish tint to them. He has experience with PCP users and explained they are irritable, sweat a lot, like to fight, and are aggressive. There was suspected phencyclidine on the cigarettes, and when they returned to Jefferson County Correctional Facility, Fells weighed them.

During his testimony, the State admitted Fells's bodycam and dashcam videos, and portions of these were played for the jury. Fells testified the dashcam video shows the vehicle crossing the street in the distance at the four-way stop at the

8

intersection of Gulf and Delaware, and after going through the intersection, the driver of the Encore eventually pulled over.

**Marsha Cox's Testimony**

Jefferson County Regional Crime Laboratory Chemist Marsha Cox analyzed the cigarettes that Ballard took from Traylor before he was jailed. At Traylor's trial, she testified the cigarettes contained PCP and weighed slightly over 4.2 grams. Cox testified that dipped cigarettes have a strong odor and "can have a slight coloration to it." Cox testified that the cigarettes could have initially had a brownish tint, but when she performed the analysis, the cigarettes were not discolored. Cox agreed it was possible with the passage of time that the cigarettes were no longer discolored. The report Cox prepared was admitted into evidence during her testimony.

**Motion to Suppress**

Traylor filed a Motion to Suppress and argued that tangible evidence, including the substance alleged to be PCP, was seized without a warrant, probable cause or "other lawful authority in violation of the rights of . . . Traylor" under the United States Constitution and Texas Constitution. The trial court carried the motion through trial and then conducted a hearing outside the jury's presence. In the hearing, the trial court asked the defense if it was going to introduce any additional evidence, and it declined. During the hearing, the defense challenged the original vehicle stop

and argued the police officer testified the driver first denied running the stop sign and that the video seems to show he stopped, so everything that happened after violated Traylor's rights. Traylor also complained that officers should not have arrested him for public intoxication since he was not in public by his choice – he was detained and placed in the roadway. The trial court denied the Motion to Suppress.

**Jury Charge**

During the charge conference, Traylor requested an article 38.23 instruction and argued: (1) there was conflicting evidence about whether the driver ran the stop sign based on the officers' testimony; and (2) the officers' testimony and the video evidence created a fact issue about whether Traylor was intoxicated and should have been arrested for public intoxication. Traylor provided the following proposed written instruction to include the charge:

Instruction - Evidence Not To Be Used

Any evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas or of the Constitution or laws of the United States shall be disregarded by the jury.
You are instructed that before an officer has the right to make an arrest of a defendant[,] the officer must have probable cause that the defendant committed a crime[.]

"Probable Cause" to arrest is the reasonable belief that the person has committed a crime[.]

Now, therefore, if you believe, or have a reasonable doubt, that the evidence was obtained as a result of an arrest or detention not based on probable cause, then and in such event, you shall disregard any such evidence so obtained.

The trial court refused the proposed instruction and stated, "As the Court recalls the evidence, the driver of the car did state he did not run the stop sign but later admitted to running the stop sign."

**Verdict**

After the jury convicted him and assessed punishment at twenty-five years of confinement, Traylor timely appealed the trial court's judgment.

## II. Analysis

In his sole issue, Traylor complains the trial court erred by refusing his requested jury instruction and definition. Essentially, he challenges the validity of 1) the officers' initial stop of the vehicle, and 2) Traylor's subsequent arrest for public intoxication resulting in the search incident to arrest where the dipped cigarettes were located.

**Standard of Review**

When reviewing whether the trial court properly charged the jury, we first determine whether error occurred, and if there was no error, our analysis ends. *See Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). The jury charge instructs jurors on "all of

11

the law that is applicable to the case." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citation omitted); *see also* Tex. Code Crim. Proc. Ann. art. 36.14. If we determine the trial court erred, our harm analysis and the standard of review employed depends on whether error was preserved as outlined in *Almanza v. State*. *See* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op on reh'g).

**Law**

When there is a disputed fact issue material to a defendant's claim of a constitutional or statutory violation that would render evidence inadmissible, an article 38.23 exclusionary-rule instruction is required. *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007). Texas Code of Criminal Procedure article 38.23 provides that where evidence raises an issue, "the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." Tex. Code Crim. Proc. Ann. art. 38.23. A defendant is entitled to a 38.23 instruction only if the evidence raises a "disputed fact issue." *Madden*, 242 S.W.3d at 509–10. "A defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Id*. (citation omitted). Under *Madden*, there are three

12

requirements for the mandatory inclusion of a 38.23 instruction: "(1) [t]he evidence heard by the jury must raise an issue of fact; (2) [t]he evidence on that fact must be affirmatively contested; and (3) [t]hat contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence." *Id.* at 510; *see Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (citations omitted) (stating same).

For a traffic stop to comply with the Fourth Amendment, an officer must have "'reasonable suspicion.'" *Hamal*, 390 S.W.3d at 306 (citing *York v. State*, 342 S.W.3d 528, 536 (Tex. Crim. App. 2011)). "Under the Fourth Amendment, 'reasonable suspicion' exists when an officer is aware of 'specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity.'" *York*, 342 S.W.3d at 536 (quoting *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)) (other citation omitted). The reasonable suspicion standard is objective, and the officer's subjective intent is irrelevant. *Id.* This standard merely requires "'some minimal level of objective justification'" for the stop. *Hamal*, 390 S.W.3d at 306 (quoting *Foster v. State*, 326 S.W.3d 609, 614 (Tex. Crim. App. 2010)).

A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question, and the arrest falls within one of the exceptions set out in the Code of Criminal Procedure. *State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). Texas Code of Criminal Procedure article 14.01(b) provides that an officer may arrest someone absent a warrant if the offense is committed in his view. *See* Tex. Code Crim. Proc. Ann. art. 14.01(b). "Probable cause for a warrantless arrest under article 14.01(b) may be based on an officer's prior knowledge and personal observations, and an officer may rely on reasonably trustworthy information provided by another person in making the overall probable cause determination." *Martinez*, 569 S.W.3d at 628.

"A person commits public intoxication if he appears in a public place while intoxicated to the degree that he may endanger himself or another." *Id.* (citing Tex. Penal Code Ann. § 49.02(a)). A public place means any place to which the public has access and includes, among other things, streets. *See id.*; *see also* Tex. Penal Code Ann. § 1.07(a)(40). As for the danger element, "it is sufficient that the person merely rendered himself or others subject to potential danger." *Martinez*, 569 S.W.3d at 628 (citing *Dickey v. State*, 552 S.W.2d 467, 468 (Tex. Crim. App. 1977)).

Absent any specific dispute over historical facts, the determination of whether probable cause existed was one for the trial court, not one for the jury under article 38.23. *See Madden*, 242 S.W.3d at 511 (explaining that trial judge decides the "quality and quantum of facts necessary" to establish "a legal term of art" like "reasonable suspicion" or "probable cause" and only if one or more necessary facts is disputed, does the trial judge ask the jury to decide whether officer's belief in those facts was reasonable); *Garza v. State*, 126 S.W.3d 79, 86 (Tex. Crim. App. 2004) ("That appellant 'disagrees with the *conclusion* that probable cause was shown as a matter of law' is not the same as appellant controverting the *facts*.") (emphasis original, internal quotation omitted).

Though not clear, liberally construing his brief, Traylor seems to challenge 1) the original traffic stop, and 2) his arrest for public intoxication which led to the search incident to that arrest. We will address each in turn. We first note that Traylor's proposed instruction and definition were incorrect as it did not point to any disputed facts that the jury would need to resolve either with respect to the initial stop or to the arrest for public intoxication. *See Madden*, 242 S.W.3d at 511 (explaining that the first requirement to obtaining a 38.23 instruction is that one is requested on a specific historical fact or facts). As the Court of Criminal Appeals explained in *Madden* where a requested instruction failed to include specific

disputed facts, "Looking just at appellant's requested jury instruction, neither the trial judge, the court of appeals, nor ourselves could have any idea of what specific fact or facts appellant believed were in dispute." *Id.* at 511–12.

**Application: There was no disputed fact issue with the traffic stop.**

Officers had reasonable suspicion to stop the Buick if they witnessed a violation of Section 544.010 of the Texas Transportation Code. *See* Tex. Transp. Code Ann. § 544.010(a), (c) (requiring driver to bring vehicle to stop at stop sign). If an officer has a reasonable basis for suspecting a person committed a traffic offense, he may legally initiate a traffic stop. *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992); *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd) (citation omitted). As the sole reason for the initial stop, the officers had to reasonably believe the driver failed to come to a complete stop at the stop sign located at the intersection of Delaware and Gulf. *See Graves*, 307 S.W.3d at 489; *see also* Tex. Transp. Code Ann. § 544.010(a), (c). In the trial court, Traylor asserted there was a disputed fact issue about whether the driver ran the stop sign based on the officers' testimony, thus entitling him to a 38.23 instruction. We disagree.

The only witnesses to testify about the stop were Fells and Ballard. Both testified that the driver did not come to a complete stop at the intersection. Defense

counsel vigorously cross-examined Fells about the traffic violation, insinuating that the vehicle had stopped and pointed to the driver's initial denial that he ran the stop sign. Cross-examination is not affirmative evidence putting a fact in dispute, but a witness's answers may. *See Madden*, 242 S.W.3d at 513–14. In the face of cross-examination, Fells testified that although the driver initially denied running the stop sign, the driver ultimately admitted he had. Additionally, less than one minute into the dashcam video, the vehicle is seen in the distance rolling through the intersection without stopping. As the officers pursue, the dashcam shows four stop signs at the intersection. Rather than dispute that the driver did not stop, this testimony and video evidence confirms it.

During the hearing on the Motion to Suppress, defense counsel also argued that it appeared to him in the dashcam video that the vehicle stopped. A factual dispute requiring an article 38.23 instruction "can be raised only by affirmative evidence, not by mere cross-examination questions or argument." *Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008); *see Madden*, 242 S.W.3d at 513–14. Defense counsel's argument about what the video showed is not evidence and cannot create a factual dispute. There must be some affirmative evidence—here, the video—showing the driver came to a complete stop in the record before there is a disputed fact issue. *See Oursbourn*, 259 S.W.3d at 177–78; *Madden*, 242 S.W.3d

17

at 514 (noting same in context of speeding). We have reviewed the video, and it does not affirmatively show the vehicle came to a complete stop. Instead, the video shows the car rolling through the intersection from a distance without stopping. Absent a dispute about what the officers observed, Traylor was not entitled to an article 38.23 instruction. *See Hamal*, 390 S.W.3d at 307; *Madden* 242 S.W.3d at 510; *see also* Tex. Code Crim. Proc. Ann. art. 38.23(a). We conclude the evidence failed to raise a fact issue about the initial vehicle stop and detention to warrant an article 38.23 instruction.

**Application: There was no disputed fact issue regarding the public intoxication arrest.**

We now turn to whether officers had probable cause to arrest Traylor for public intoxication. Traylor's proposed instruction and definition does not mention any disputed facts surrounding the arrest. Rather, his requested instruction and definition seem to challenge the conclusion that officers had probable cause for that arrest. A jury instruction is proper "only if there is a contested issue of fact about obtaining the evidence." *Pierce v. State*, 32 S.W.3d 247, 251 (Tex. Crim. App. 2000). There is no issue for the jury to decide when the question is only one of law. *Id.; see also Madden*, 242 S.W.3d at 511; *Garza*, 126 S.W.3d at 86. The officers both testified that they believed Traylor was intoxicated and specified several signs of intoxication he exhibited, which no evidence contradicted. The officers also

18

testified that once they removed Traylor from the vehicle, they could not allow him to walk home on a dark, poorly-lit street in that condition, because it was unsafe for him and potentially others. The officers also testified that Traylor had no responsible person to pick him up. Again, no evidence in the record contradicts this.

At trial, defense counsel again vigorously cross-examined the officers about whether the video showed Traylor slurring his speech. Not only did officers insist he did, they pointed to several other signs of intoxication. As explained above, cross-examination alone does not create a fact issue without answers that do. *See Madden*, 242 S.W.3d at 513. Counsel also argued the video seemed to show Traylor was not intoxicated but did not say why or what signs of intoxication the officers identified that the video contradicted. In *Madden*, defense counsel likewise argued a dashcam video created a fact issue. *See Madden*, 242 S.W.3d at 515–16. In ultimately concluding the dashcam video did not create a fact issue, the Court of Criminal Appeals reasoned,

> Only if the video clearly showed that appellant affirmatively did not do something that [the officer] said that he did do, and the video clearly would have shown that conduct if it had occurred, would there be some affirmative evidence of a disputed historical fact. But the video recording in this case apparently does not show much of anything with clarity.

*Id.* at 516.

Based upon the officers' testimony and the videos, the trial court determined that the videos do not show that Traylor did not exhibit the signs of intoxication. The only evidence in the record is consistent with the officers' testimony that Traylor exhibited multiple signs of intoxication, their testimony that he was on a public street with no responsible person to retrieve him, and the opinions they expressed that under the circumstances they thought it would be unsafe to allow him to walk home in his condition. We conclude the evidence likewise failed to raise a disputed fact issue regarding Traylor's arrest for public intoxication and the search incident to that arrest to warrant an article 38.23 instruction. Absent evidence raising a genuine issue of material fact disputing the officers' testimony about the historical facts, there was nothing for the jury to decide, and the existence of probable cause was a question of law for the trial court. *See Madden*, 242 S.W.3d at 511; *Garza*, 126 S.W.3d at 86; *Pierce*, 32 S.W.3d at 251. Thus, the trial court did not err in denying Traylor's requested instruction and definition. *See Madden*, 242 S.W.3d at 505–06. We overrule his sole issue.

### III. Conclusion

We conclude the evidence did not affirmatively show a disputed fact issue that placed the constitutional validity of the traffic stop and Traylor's subsequent arrest in issue, so he was not entitled to the requested article 38.23 instruction and

20

definition. *See id.* Having overruled his sole issue, we affirm the trial court's judgment.

        AFFIRMED.


W. SCOTT GOLEMON
Chief Justice

Submitted on November 13, 2023
Opinion Delivered February 21, 2024
Do Not Publish

Before Golemon, C.J., Horton and Wright, JJ.